[No. S069688. June 1, 1999.]

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Petitioners, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN
FRANCISCO, Respondent;
TIM MOLLOY et al., Real Parties in Interest.

COUNSEL

Orrick, Herrington & Sutcliffe, Cynthia J. Larsen, Adam Gutride and Lynn Trinka Ernce for Petitioner Gray Davis, as Governor.

James E. Holst; John F. Lundberg; Gary Morrison; Jeffrey A. Blair; and Christopher M. Patti for Petitioner the Regents of the University of California.

No appearance for Respondent.

ACLU Foundation of Southern California, Mark D. Rosenbaum, Daniel P. Tokaji, Peter Eliasberg; ACLU Foundation of Northern California,

Edward Chen; Karl Manheim; James E. Wheaton; Elizabeth Pritzker; Beth H. Parker; Juhu Thukral; Eva J. Paterson; and Michael Harris for Real Parties in Interest.

Steinhart & Falconer, Roger R. Myers and Joshua Koltun for California Community News Corporation, the Copley Press, Inc., Los Angeles Times, the McClatchy Company, Press-Enterprise Company, Pulitzer Community Newspapers, Inc., San Francisco Examiner, San Jose Mercury News, California First Amendment Coalition, California Newspaper Publishers Association, Reporters Committee for Freedom of the Press, Society of Professional Journalists (Northern California Chapter) and San Francisco State University Journalism Department as Amici Curiae on behalf of Real Parties in Interest.

Rothner, Segall & Greenstone, Glenn Rothner and Julia Harumi Mass for California Teachers Association, California Faculty Association, American Federation of State, County and Municipal Employees and Service Employees International Union as Amici Curiae on behalf of Real Parties in Interest.

Roy Ulrich for Common Cause as Amicus Curiae on behalf of Real Parties in Interest.

## OPINION

**MOSK, J.**—The Bagley-Keene Open Meeting Act (hereafter sometimes the act), which is set out at section 11120 et seq. of the Government Code,[1] governs the conduct of state bodies and imposes on such bodies various obligations, including that they must generally give prior notice of their meetings, pursuant to section 11125, and must generally cause such meetings to be open and public, pursuant to section 11123.

We granted review in this cause to address two important questions of first impression.

One question concerns the right of action granted by subdivision (a) of section 11130 (hereafter section 11130(a)): "[A]ny interested person may commence an action by mandamus, injunction, or declaratory relief for the purpose of stopping or preventing violations or threatened violations of" the act "or to determine the applicability of" the act "to actions or threatened future action by members of" a "state body . . . ." Does this right of action extend only to present and future actions and violations and not past ones?

---

[1]Except as noted, all references to sections are to the Government Code.

The other question concerns the right of action granted by subdivision (a) of section 11130.3 (hereafter section 11130.3(a)): "Any interested person may commence an action by mandamus, injunction, or declaratory relief for the purpose of obtaining a judicial determination that an action taken by a state body in violation of" the act's notice or open-and-public-meeting requirement is "null and void . . . . Any action seeking such a judicial determination shall be commenced within 30 days from the date the action was taken." Is this right of action limited by the 30-day statute of limitations contained therein?

As we shall explain, we conclude that the answer to each of these questions is affirmative.

## I

The Regents of the University of California are a corporation with full powers of organization and government over the university, subject only to specified control by the Legislature. (Cal. Const., art. IX, § 9, subd. (a).) The corporation is in the form of a board composed of 25 members. (*Ibid.*) It numbers seven members ex officio, including the Governor, and eighteen members appointed by the Governor and approved by the Senate (*ibid.*)— who may, in their discretion, appoint a faculty member or a student member or both (*id.*, art. IX, § 9, subd. (c)).

On July 20, 1995, having given prior notice, the Regents held an open and public meeting in order to consider two items listed on their agenda. At that time, the board comprised 26 members, including Edward P. Gomez, a student who had been appointed by the other members. Of the 26 members, 25 were present. One of the items was SP-1, entitled "Adoption of Resolution: Policy Ensuring Equal Treatment—Admissions," which, among other things, would prohibit the university from "us[ing] race, religion, sex, color, ethnicity, or national origin as criteria for admission to the [u]niversity or to any program of study," effective January 1, 1997. The other of the items was SP-2, entitled "Adoption of Resolution: Policy Ensuring Equal Treatment—Business Practices and Employment (or Employment and Contracting)," which, among other things, would similarly prohibit the university from "us[ing] race, religion, sex, color, ethnicity, or national origin as criteria in its employment and contracting practices," effective January 1, 1996. The meeting spanned 12½ hours. Following deliberations, the Regents approved

both SP-1 and SP-2, the former on a vote of 14 to 10 with 1 abstention, the latter on a vote of 15 to 10.[2]

On February 16, 1996, almost seven months later, Tim Molloy and the Daily Nexus (hereafter collectively Molloy) filed a complaint in the Superior Court of the City and County of San Francisco against the Regents, including, specifically, Governor Pete Wilson in his capacity as a regent (hereafter collectively the Regents); Molloy identified himself as a taxpayer and a staff reporter and campus editor of the Daily Nexus, and the Daily Nexus identified itself as a student-run newspaper serving the students, faculty, and staff of the University of California, Santa Barbara.

Molloy asserted a first cause of action against the Regents, based on a violation of the Bagley-Keene Open Meeting Act—specifically, its notice and open-and-public-meeting requirements. He alleged, in substance, that, prior to the noticed and open and public meeting of July 20, 1995, the Regents made a collective commitment or promise to approve SP-1 and SP-2, at a "meeting" of at least a quorum[3] of the board's members conducted in secret through a series of one-to-one telephone and other communications, each initiated by the Governor. For a right of action, he impliedly relied on what is now section 11130(a). To the same end, he also expressly relied on section 11130.3(a). In anticipation of an affirmative defense based on that provision's 30-day statute of limitations, he undertook to invoke against the Regents the doctrine that a defendant who has fraudulently concealed a cause of action may be equitably estopped from raising such a defense, alleging, in pertinent part, to the following effect: On August 3, 1995, he placed a telephone call to the Governor's press office; he asked an unidentified person whether the Governor had telephone or other communications with other regents regarding SP-1 and SP-2 prior to July 20, 1995; the unidentified person responded with a denial; over the following months, he submitted 28 requests to the Governor under the California Public Records Act, which is set out at section 6250 et seq., seeking disclosure of public records relating to telephone communications by the Governor with other regents; in response, the Governor refused disclosure; on January 17, 1996,

---

[2]Subsequently, at the November 5, 1996, General Election, the voters approved an initiative constitutional amendment that was designated on the ballot as Proposition 209. The measure added section 31 to article I of the California Constitution, which declares in subdivision (a) that "[t]he State"—including the University of California—"shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting."

[3]Nine is a quorum for a regular meeting of the Regents, twelve for a special one. (Bylaws of Regents of U. of Cal., bylaw No. 16.3.)

through the Governor's several responses refusing disclosure, he was given reason to believe that the Governor had contacted at least 10 other regents concerning the proposed resolutions.

Molloy asserted a second cause of action, against the Governor, based on a violation of the California Public Records Act. He alleged his 28 requests to the Governor seeking disclosure of public records relating to telephone communications by the Governor with other regents, and the Governor's refusal of such requests. For a right of action, he relied on section 6258: "Any person may institute proceedings for injunctive or declarative relief or writ of mandate in any court of competent jurisdiction to enforce his or her right to inspect or to receive a copy of any public record or class of public records" under this act.

As for the Bagley-Keene Open Meeting Act cause of action, Molloy sought relief including: (1) a declaration that the Regents violated the act by making a collective commitment or promise to approve SP-1 and SP-2, prior to the noticed and open and public meeting of July 20, 1995, at the alleged secret serial "meeting" of at least a quorum of the board's members, including the Governor; (2) a declaration that the Regents' approval of the resolutions at the noticed and open and public meeting of July 20 was null and void; and (3) an injunction prohibiting the Regents from implementing either of the resolutions on the ground that each was null and void.

As for the California Public Records Act cause of action, Molloy sought relief including: (1) a declaration that the Governor violated the act by refusing his 28 requests seeking disclosure of public records relating to telephone communications by the Governor with other regents; and (2) an injunction requiring the Governor to disclose such public records.

The Regents demurred to the complaint, the board as an entity and the Governor as one of its members each doing so in separate but complementary submissions. They objected that the Bagley-Keene Open Meeting Act cause of action did not state sufficient facts. In pertinent part, they argued to the effect that, under the facts alleged, Molloy did not have any right of action pursuant to section 11130.3(a) because he commenced his action almost six months after the provision's thirty-day statute of limitations had run; that that statute of limitations precluded the doctrine of fraudulent concealment; and that, even if the statute did not do so, the doctrine would nevertheless not be available in this case. They made no mention, however, as to whether he had any right of action pursuant to section 11130(a). They similarly objected that the California Public Records Act cause of action did

not state sufficient facts. In pertinent part, they argued to the effect that, under the facts alleged, any public record relating to telephone communications by the Governor with other regents was exempt from disclosure under the deliberative-process, legislative, official-information, and Governor's correspondence privileges.

The superior court issued an order overruling the demurrers. It rejected the Regents' objection that the Bagley-Keene Open Meeting Act cause of action did not state sufficient facts. In pertinent part, it concluded to the effect that section 11130.3(a)'s 30-day statute of limitations did not preclude the doctrine of fraudulent concealment, and that the question whether the doctrine was available in this case implicated facts beyond the complaint, and hence could not be resolved on demurrer. It also rejected their objection that the California Public Records Act cause of action did not state sufficient facts. In pertinent part, it concluded to the effect that the question whether any public record relating to telephone communications by the Governor with other regents was exempt from disclosure under the deliberative-process, legislative, official-information, or Governor's correspondence privilege implicated facts beyond the complaint, perhaps entailing review of such records in camera, and hence could not be resolved on demurrer.

Challenging the superior court's order overruling their demurrers, the Regents petitioned the Court of Appeal for the First Appellate District for a writ of mandate, the board as an entity and the Governor as one of its members doing so in a joint submission. In conjunction therewith, they requested a stay of all proceedings below pendente lite.

Division Three of the Court of Appeal for the First Appellate District, to which the matter was assigned, summarily denied the Regents' petition. It also refused their stay request.

The Regents petitioned us for review in a joint submission by the board and the Governor. We denied their application.

The Regents then answered the complaint in separate but complementary submissions by the board and the Governor. Among other things, as for the Bagley-Keene Open Meeting Act cause of action, they impliedly denied that Molloy had any right of action pursuant to section 11130.3(a); in addition, they expressly raised, as an affirmative defense, that any right of action that he may have had thereunder he had no longer because he commenced his action almost six months after the provision's thirty-day statute of limitations had run; but they did not make any pertinent mention of any right of action that he may have had pursuant to section 11130(a). As for the

California Public Records Act cause of action, they asserted that any public record relating to telephone communications by the Governor with other regents was exempt from disclosure under (apparently) the deliberative-process, legislative, official-information, and Governor's correspondence privileges.

The Regents moved for summary adjudication as to the Bagley-Keene Open Meeting Act cause of action in a joint submission by the board and the Governor. Evidently, the superior court issued an order denying the motion.

After taking Molloy's deposition, the Regents moved for summary judgment, again in a joint submission by the board and the Governor. On the Bagley-Keene Open Meeting Act cause of action, they claimed that there was no triable issue of material fact and that they were entitled to judgment as a matter of law. In support, they argued that, under the undisputed facts, Molloy did not have any right of action pursuant to section 11130(a) because, in effect, the provision extends only to present and future actions and violations and not past ones. They also argued that, under the undisputed facts, he did not have any right of action pursuant to section 11130.3(a) because he commenced his action almost six months after the provision's thirty-day statute of limitations had run; that that statute of limitations precluded the doctrine of fraudulent concealment; and that, even if the statute did not do so, the doctrine was nevertheless not available in this case. The undisputed facts referred to above included the following, derived directly or indirectly from Molloy's deposition: Both before and after July 20, 1995, Molloy obtained information bearing on the existence or nonexistence of a collective commitment or promise by the Regents to approve SP-1 and SP-2, prior to the noticed and open and public meeting of July 20, at the alleged secret serial "meeting" of at least a quorum of the board's members, including the Governor; both before and after July 20, he published such information in articles that he authored or contributed to. Among such information was this: On July 20, prior to the vote, Regent Gomez told Molloy, as Molloy himself admitted: "They're set. They've been set for a while." Also on July 20, following the vote, Regent Gomez told Molloy, again according to Molloy's own admission: "Staged. Ten-fifteen [*sic*] every single time. Old boys versus the new progressives." On the California Public Records Act cause of action, they similarly claimed that there was no triable issue of material fact and that they were entitled to judgment as a matter of law. In support, they argued that any public record relating to telephone communications by the Governor with other regents was exempt from

---

[4]As noted in the text, although the Regents approved SP-2 on a vote of 15 to 10, they approved SP-1 on a vote of 14 to 10 with 1 abstention.

disclosure under the deliberative-process, legislative, official-information, and Governor's correspondence privileges.

The superior court issued an order denying the Regents' summary judgment motion. It concluded that they were not entitled to judgment as a matter of law on Molloy's Bagley-Keene Open Meeting Act cause of action. Without considering any right of action pursuant to section 11130(a), it determined, in substance, that there was a triable issue of material fact whether he had a right of action pursuant to section 11130.3(a). It recognized that he commenced his action almost six months after the provision's thirty-day statute of limitations had run. Nevertheless, it believed that that statute of limitations did not preclude the doctrine of fraudulent concealment. It also believed that the doctrine might be available in this case to toll the statute through the filing of the complaint almost six months later. Because of its conclusion on Molloy's Bagley-Keene Open Meeting Act cause of action, it did not reach his California Public Records Act cause of action.

Challenging the superior court's order denying their summary judgment motion, the Regents petitioned the Court of Appeal for the First Appellate District for a writ of mandate in a joint submission by the board and the Governor.

In advance of any peremptory writ of mandate, Division Three of the Court of Appeal for the First Appellate District, to which this matter too was assigned, caused issuance of an alternative writ. Subsequently, in an opinion not certified for publication, it rendered judgment discharging the alternative writ and denying the petition insofar as it sought a peremptory writ. At the threshold, it impliedly concluded that the superior court's order denying the Regents' summary judgment motion, and its resolution of the underlying statutory-construction issues, were subject to independent review. On the merits, it upheld the superior court's order. It concluded that the Regents were not entitled to judgment as a matter of law on Molloy's Bagley-Keene Open Meeting Act cause of action. It determined, in substance, that, under the undisputed facts, he had a right of action pursuant to section 11130(a). It believed that that right of action extends to past actions and violations as well as present and future ones. But it also determined, in substance, that, under the undisputed facts, he did not have any right of action pursuant to section 11130.3(a). It assumed for purpose of analysis only that that provision's 30-day statute of limitations did not preclude the doctrine of fraudulent concealment. But, unlike the superior court, it believed that the doctrine was not available to toll the statute through the filing of the complaint almost

six months later. Because of its conclusion on Molloy's Bagley-Keene Open Meeting Act cause of action, it did not reach his California Public Records Act cause of action.

The Regents petitioned us for review in a joint submission by the board and the Governor. We granted their application. We now reverse.

## II

Before we address the questions arising under the Bagley-Keene Open Meeting Act relating to the rights of action granted by section 11130(a) and section 11130.3(a), we must review the provisions of the act that bear on the answers.

## A

In 1967, the Legislature enacted the Bagley-Keene Open Meeting Act, as it was subsequently entitled, in order to govern the conduct of state bodies and to impose on such bodies various obligations, including that they must generally give prior notice of their meetings and must generally cause such meetings to be open and public. (Stats. 1967, ch. 1656, § 122, p. 4026 et seq.)[5]

In section 11120, the act has declared since its enactment as follows: "It is the public policy of this state that public agencies exist to aid in the conduct of the people's business and the proceedings of public agencies be conducted openly so that the public may remain informed. [¶] . . . [I]t is the intent of the law that actions of state agencies be taken openly and that their deliberation be conducted openly." (Stats. 1967, ch. 1656, § 122, p. 4026.) In 1981, it was amended to declare in addition: "The people of this state do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created." (Stats. 1981, ch. 968, § 4, p. 3683.)

In section 11122, the act, as originally enacted, provided: " '[A]ction taken' means a collective decision made by the members of a state agency,

---

[5]In 1953, prior to the Bagley-Keene Open Meeting Act, the Legislature had enacted the Ralph M. Brown Act (hereafter the Brown Act), as it was subsequently entitled, which is set out at section 54950 et seq., in order to govern the conduct of legislative bodies of local agencies and to impose on such bodies various obligations, including that they must generally give prior notice of their meetings and must generally cause such meetings to be open and public. (Stats. 1953, ch. 1588, § 1, p. 3269 et seq.) The two statutes are similar in some respects and dissimilar in others.

a collective commitment or promise by the members of the state agency to make a positive or negative decision or an actual vote by the members of a state agency when sitting as a body or entity upon a motion, proposal, resolution, order or similar action." (Stats. 1967, ch. 1656, § 122, p. 4026.) In 1981, it was amended into its present form to replace "agency" (*ibid.*) with "body" (Stats. 1981, ch. 968, § 7.3, p. 3685).

Since its enactment, the act has generally required state bodies to give prior notice of their meetings, pursuant to section 11125 (Stats. 1967, ch. 1656, § 122, p. 4026), and to cause such meetings to be open and public, pursuant to section 11123 (Stats. 1967, ch. 1656, § 122, p. 4026).

In section 11130, the act, as originally enacted, provided: "Any interested person may commence an action either by mandamus or injunction for the purpose of stopping or preventing violations or threatened violations of" the act "by members of" a "state agency." (Stats. 1967, ch. 1656, § 122, p. 4028.) In 1969, it was amended: "Any interested person may commence an action by mandamus, injunction, or declaratory relief for the purpose of stopping or preventing violations or threatened violations of" the act "or to determine the applicability of" the act "to actions or threatened future action by members of" a "state agency." (Stats. 1969, ch. 494, § 1, p. 1106.) In 1981, it was further amended to replace "agency" (*ibid.*) with "body" (Stats. 1981, ch. 968, § 20, p. 3693). In 1997, without substantial change in any pertinent part, it was amended into its present form under its present designation as section 11130(a). (Stats. 1997, ch. 949, § 13.)

Section 11130.3 was not part of the act as originally enacted. In 1985, it was added (Stats. 1985, ch. 936, § 1, p. 2963 et seq.), and has never been amended. It provides:

"(a) Any interested person may commence an action by mandamus, injunction, or declaratory relief for the purpose of obtaining a judicial determination that an action taken by a state body in violation of" the act's notice or open-and-public-meeting requirement is "null and void . . . . Any action seeking such a judicial determination shall be commenced within 30 days from the date the action was taken. Nothing in this section shall be construed to prevent a state body from curing or correcting an action challenged pursuant to this section.

"(b) An action shall not be determined to be null and void if any of the following conditions exist:

"(1) The action taken was in connection with the sale or issuance of notes, bonds, or other evidences of indebtedness or any contract, instrument, or agreement related thereto.

"(2) The action taken gave rise to a contractual obligation upon which a party has, in good faith, detrimentally relied.

"(3) The action taken was in substantial compliance with [the act's notice and open-and-public-meeting requirements].

"(4) The action taken was in connection with the collection of any tax."

Similarly, section 11130.7 was not part of the act as originally enacted. In 1980, it was added to provide: "Each member of a state agency who attends a meeting of such agency in violation of any provision of" the act, "with knowledge of the fact that the meeting is in violation thereof, is guilty of a misdemeanor." (Stats. 1980, ch. 1284, § 16, p. 4341.) In 1981, it was amended to replace "agency" (*ibid.*) with "body" (Stats. 1981, ch. 968, § 22, p. 3693). In 1997, it was amended into its present form: "Each member of a state body who attends a meeting of that body in violation of any provision of" the act, "and where the member intends to deprive the public of information to which the member knows or has reason to know the public is entitled under" the act, "is guilty of a misdemeanor." (Stats. 1997, ch. 949, § 14.)

B

The first question before us is whether the right of action granted by section 11130(a) under the Bagley-Keene Open Meeting Act extends only to present and future actions and violations and not past ones.

Focusing on section 11130(a) itself, we are of the opinion that the answer is affirmative: the provision's right of action does indeed extend only to present and future actions and violations and not past ones.

Section 11130(a) states that "any interested person may commence an action . . . for the purpose of stopping or preventing violations or threatened violations of" the act "by members of" a "state body," or "to determine" the act's "applicability . . . to actions or threatened future action" by such persons.

Section 11130(a)'s right of action depends for its extent on whether it refers to past and/or present and/or future actions and violations.

Plainly, section 11130(a)'s right of action points toward the *future*: "[A]ny interested person may commence an action . . . for the purpose of . . . *preventing . . . threatened* violations of" the act "by members of" a "state

body," or "to determine" the act's "applicability . . . to . . . *threatened future* action" by such persons. (Italics added.) In this regard, it covers violations and actions *that are yet to occur*.

Almost as plainly, section 11130(a)'s right of action also points toward the *present*: "[A]ny interested person may commence an action . . . for the purpose of *stopping* . . . violations" of the act "by members of" a "state body," or "to determine" the act's "applicability . . . to actions" by such persons (Italics added.). In this regard, it covers violations and actions *that are occurring, including both discrete instances and continuing patterns or practices*.

By contrast, section 11130(a)'s right of action does not point toward the *past*, plainly or otherwise.

The language of section 11130(a) argues against the past. Insofar as it deals with "preventing threatened violations" of the act and "determining" its "applicability to threatened future action," its focus is explicitly on the future. Insofar as it deals with "stopping violations" of the act and "determining" its "applicability to actions," its focus is implicitly on the present. In the phrase "stopping violations," it shows its present orientation by usage. One speaks of "stopping" present "violations," but not past ones. In the phrase "determining applicability to actions," it shows its present orientation by context. Without express adjectival modification, the noun "actions" may indeed be subject to implied modification. Its textual surroundings are the present and the future, without any reference or allusion, express or implied, to the past. Had the Legislature meant to include the past, it would have made itself plain, likely through the phrase "actions *taken*," which, in the singular, appears, time and again, throughout the act. (See §§ 11122, 11125.2, 11125.5, subds. (c) & (d), 11125.6, subd. (d), 11126, subds. (a)(2) & (f)(8), 11126.3, subd. (f), 11130.3.) It did not do so. To be sure, it *might have used* "actions" without modification to refer to the past as well as the present. But any evidence that it actually did is no more than conjecture and speculation.

The operation of section 11130(a) brings the argument against the past to a persuasive conclusion. Insofar as it concerns itself with the present by "stopping violations" of the act and "determining" its "applicability to actions," it offers effective relief. The same is true insofar as it concerns itself with the future by "preventing threatened violations" of the act and "determining" its "applicability to threatened future action." It would be otherwise if it concerned itself with the past. One cannot "stop" or "prevent"

past "violations" of the act, and hence cannot provide any relief whatsoever thereby, effective or ineffective. One can, however, "determine" whether the act was "applicable" to a past "action"—but to what end? There is no indication that such a determination under section 11130(a) is a prerequisite to an action seeking nullification and voidance of an action taken by a state body in violation of the act's notice or open-and-public-meeting requirement: an action of this sort may evidently be brought independently. Neither is there any indication that such a determination under section 11130(a) is a prerequisite to a criminal prosecution under section 11130.7 against individual members of the state body: a criminal prosecution of this sort may evidently be instituted independently. An action seeking a bare "determination" that the act was "applicable" to a past "action" might be characterized, positively, as a means to "educate" the state body in question and its individual members or, negatively, as a device for subjecting them to "harassment." No matter how it is characterized, however, it would be substantially inutile. The Legislature could conceivably choose to provide for relief of this kind—relief in appearance but not reality. From all that we can discern, it did not do so here.

Looking beyond section 11130(a) itself to its legislative history, we find confirmation for our conclusion that the provision's right of action extends only to present and future actions and violations and not past ones.

Recall that, in section 11130, the act, as originally enacted in 1967, provided: "Any interested person may commence an action either by mandamus or injunction for the purpose of stopping or preventing violations or threatened violations of" the act "by members of" a "state agency." (Stats. 1967, ch. 1656, § 122, p. 4028.)

In 1969, Member of the Assembly William T. Bagley, one of the authors of the eponymous act, authored Assembly Bill No. 2297, 1969 Regular Session (hereafter sometimes Assembly Bill No. 2297).

As introduced, Assembly Bill No. 2297, in pertinent part, would have added section 11131, to provide: "Any interested person may commence an action by mandamus, or injunction or declaratory relief for the purpose of stopping or preventing violations or threatened violations of" the act "or to determine the applicability of" the act "to the *past* or threatened future action or actions of" a "legislative body." (Assem. Bill No. 2297 (1969 Reg. Sess.) Apr. 8, 1969, § 1, p. 1, italics added.) It referred to past actions, although not to past violations. In addition, it would have added section 11132, which referred to past violations as well as past actions, to provide, in pertinent

part, that: (1) the Attorney General may commence an "action in quo warranto . . . for the removal from office" of "any member of a state agency" who attended a "meeting at which action" was "taken in violation of" the act, "with knowledge that the meeting" was "in violation" thereof; and (2) the "court may set aside any action taken at a meeting in violation of" the act. (Assem. Bill No. 2297 (1969 Reg. Sess.) Apr. 8, 1969, § 2, pp. 1-2.)

As subsequently amended in the Assembly, Assembly Bill No. 2297, in pertinent part, would have amended section 11130 to provide: "Any interested person may commence an action by mandamus, injunction, or declaratory relief for the purpose of stopping or preventing violations or threatened violations of" the act "or to determine the applicability of" the act "to the *past* or threatened future action or actions by members of" a "state agency." (Assem. Amend. to Assem. Bill No. 2297 (1969 Reg. Sess.) May 21, 1969, § 1, p. 2, italics added.) It continued to refer to past actions. In addition, it would have added section 11131, which was section 11132 renumbered— but without any reference whatsoever to the past, having suffered deletion of its provisions for quo warranto actions and the setting aside of action taken in violation of the act.

As amended in the Senate for the first time, Assembly Bill No. 2297, in pertinent part, now provided in section 11130: "Any interested person may commence an action by mandamus, injunction, or declaratory relief for the purpose of stopping or preventing violations or threatened violations of" the act "or to determine the applicability of" the act "to actions or threatened future action by members of" a "state agency." (Sen. Amend. to Assem. Bill No. 2297 (1969 Reg. Sess.) June 6, 1969, § 1, p. 1.) It no longer referred to past actions, having lost the adjective "past" through deletion.

As amended in the Senate for the second and final time, Assembly Bill No. 2297, in pertinent part, continued to provide in section 11130 as it had provided previously, without any reference to past actions or even to the past at all. (Sen. Amend. to Assem. Bill No. 2297 (1969 Reg. Sess.) June 13, 1969, § 1, p. 1.)

In the years following 1969, section 11130 was amended twice, once in 1981 (Stats. 1981, ch. 968, § 20, p. 3693) and again in 1997 into its present form under its present designation as section 11130(a) (Stats. 1997, ch. 949, § 13). Neither time was it modified to refer to past actions or violations, or indeed to the past itself in any way. That it was not given a past orientation cannot reasonably be attributed to a belief on the part of the Legislature that

it already possessed one. ■■ ■ That is because such a belief has never left any trace of its existence.[6]

 Section 11130(a)'s legislative history, which is set out above, confirms our conclusion that the provision's right of action extends only to present and future actions and violations and not past ones. The only reference to the past existed in what was not enacted. No such reference exists in what was.

In sum, section 11130(a) grants a right of action: (1) to stop or prevent a present or future violation of the act—but *not* to reach back to a past one; and (2) to determine whether the act is applicable to a present or future action—but *not* a past one.

## C

 The second question before us is whether the right of action granted by section 11130.3(a) under the Bagley-Keene Open Meeting Act is limited by the 30-day statute of limitations contained therein.

Focusing on section 11130.3(a) itself, we are of the opinion that the answer is affirmative: the provision's right of action is indeed limited by the 30-day statute of limitations contained therein.

---

[6]In subdivision (a) of section 54960 (hereafter section 54960(a)), the Brown Act states that "any interested person may commence an action by mandamus, injunction or declaratory relief for the purpose of stopping or preventing violations or threatened violations of" the act "by members of the legislative body of a local agency or to determine the applicability of" the act "to actions or threatened future action of the legislative body . . . ." Some Court of Appeal decisions assume or assert that the provision extends to past actions and violations as well as present and future ones—albeit, apparently, only as to past actions and violations that are related to present or future ones. (See, e.g., *California Alliance for Utility etc. Education* v. *City of San Diego* (1997) 56 Cal.App.4th 1024, 1029, 1030, 1031 [65 Cal.Rptr.2d 833]; *Frazer* v. *Dixon Unified School Dist.* (1993) 18 Cal.App.4th 781, 784-785, 798 [22 Cal.Rptr.2d 641]; *Stockton Newspapers, Inc.* v. *Redevelopment Agency* (1985) 171 Cal.App.3d 95, 99-100 [214 Cal.Rptr. 561]; *Common Cause* v. *Stirling* (1983) 147 Cal.App.3d 518, 520-521 [195 Cal.Rptr. 163]; *Sutter Sensible Planning, Inc.* v. *Board of Supervisors* (1981) 122 Cal.App.3d 813, 823 -824 & 823, fn. 6 [176 Cal.Rptr. 342]; *Common Cause* v. *Stirling* (1981) 119 Cal.App.3d 658, 661-662, 665 [174 Cal.Rptr. 200]; *Torres* v. *Board of Commissioners* (1979) 89 Cal.App.3d 545, 547-551 [152 Cal.Rptr. 506] [not citing section 54960 or section 54960(a)].) None, however, actually considers whether it does so. "A decision, of course, is not authority for what it does not consider." (*Mercury Ins. Group* v. *Superior Court* (1998) 19 Cal.4th 332, 348 [79 Cal.Rptr.2d 308, 965 P.2d 1178].) Be that as it may, there is no indication that any assumption or assertion in these decisions that section 54960(a) possesses a past orientation gave rise to a belief on the part of the Legislature that section 11130(a) possesses one as well.

Section 11130.3 authorizes the nullification and voidance of an action taken by a state body in violation of the act's notice or open-and-public-meeting requirement, but only if: (1) an interested person commences an action seeking nullification and voidance within 30 days from the date the action in question was taken; (2) the action was not in substantial compliance with the requirements, and did not involve either the sale or issuance of an evidence of indebtedness or related agreement, or a contractual obligation on which a party has detrimentally relied in good faith, or the collection of a tax; and (3) the violation was not cured or corrected.

It follows, therefore, that, in enacting section 11130.3, the Legislature had as its purpose to authorize the nullification and voidance of an action taken by a state body in violation of the act's notice or open-and-public-meeting requirement, but only under strict conditions. Its purpose evidently arose as it struck a balance between two, at least potentially conflicting, objectives—to permit the nullification and voidance of certain actions, but not to imperil the finality of even such actions unduly. It accordingly chose to craft a powerful weapon, but to restrict its range.[7]

Section 11130.3(a)'s 30-day statute of limitations does not allow any extension of time expressly. It is as it appears to be: "Any action seeking . . . a judicial determination" that "an action taken by a state body in violation of" the act's notice or open-and-public-meeting requirement is "null and void" "shall be commenced *within 30 days from the date the action was taken.*" (Italics added.)

Neither does section 11130.3(a)'s 30-day statute of limitations allow any extension of time by implication.

Had it fixed the inception of its limitations period not as of the date of the taking by the state body of the action to be challenged, but instead by

---

[7]Compare *Paxson* v. *Board of Educ.* (1995) 276 Ill.App.3d 912, 923-924 [213 Ill.Dec. 288, 658 N.E.2d 1309, 1316] (Dealing with a similar open meeting act in Illinois authorizing the nullification and voidance of an action taken by a public body at a meeting in violation of the act's requirements, but only if a person commences an action therefor within 45 days from the date of the meeting in question: "[W]e . . . note" that the nullification and voidance of "governmental actions is indeed a powerful and drastic remedy that carries with it the enormous potential for upsetting the stability of government. Consequently, we find that the restriction placed on the remedy" in the form of a "very short and definite period of time in which to bring" an "action" is "more than reasonable."); *City of Prescott* v. *Town of Chino Valley* (1989) 163 Ariz. 608, 614 [790 P.2d 263], decision affirmed in its entirety and opinion vacated in part not pertinent here (1990) 166 Ariz. 480 [803 P.2d 891] (characterizing as a "heavy penalty" the nullification and voidance of an action taken by a public body at a meeting in violation of the requirements of a similar open meeting act in Arizona).

reference, without any such date, to the accrual of the underlying cause of action or to the discovery thereof, section 11130.3(a)'s 30-day statute of limitations might be deemed to allow some extension of time by implication.

■ The so-called "accrual rule" is the general one for defining the beginning of a limitations period for a cause of action (Code Civ. Proc., § 312; see generally, 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 459, pp. 580-581), setting the opening as the time "when, under the substantive law, the wrongful act is done and the . . . liability arises" (3 Witkin, Cal. Procedure, *supra*, Actions, § 459, p. 580, italics omitted). The so-called "discovery rule" is the "most important exception" thereto, postponing the opening for certain causes of action until discovery thereof. (*Id.*, § 463, p. 583.) If tolerantly applied, the accrual rule can effectively extend the beginning of a limitations period. (See, e.g., *Garver* v. *Brace* (1996) 47 Cal.App.4th 995, 999-1001 [55 Cal.Rptr.2d 220].) Even if strictly applied, the discovery rule can do the same, inasmuch as its very purpose is to trigger such an extension. (See generally, 3 Witkin, Cal. Procedure, *supra*, Actions, §§ 463-466, pp. 583-590.)

■ But section 11130.3(a)'s 30-day statute of limitation simply does not fix the inception of its limitations period by reference, without any date, to discovery or even accrual. It does so, rather, as of the date of the taking of the action in question. This fact is significant. Indeed, it is controlling. Section 11130.3 concerns itself exclusively with actions that have been taken in violation of the act's notice or open-and-public-meeting requirement. Which means actions occurring outside of the light of day. Which in turn means actions implicating fraud in effect if not fraud in intent. Because section 11130.3 so concerns itself, it would have been expected to allow some kind of extension of time by some kind of means. An example presents itself in subdivision (d) of section 338 of the Code of Civil Procedure, which fixes the inception of its three-year limitations period for an action for fraud by reference, without any date, to discovery thereof. That section 11130.3(a) does not allow any type of extension of time by any type of means in express terms practically bars the conclusion that it does so by implication.[8]

---

[8]Compare *Kennedy* v. *Powell* (La. Ct. App. 1981) 401 So.2d 453, 457 (concluding that the 60-day statute of limitations of a similar open meeting act in Louisiana authorizing the nullification and voidance of an action taken by a public body in violation of the act's requirements did not allow any extension of time, even against the possibility that "public officials" might "frustrate" the act's "purpose . . . by concealing action taken in secret for a period of sixty days": "We think the legislature felt the need to create certainty in the affairs of a [public] body . . . outweighed any danger that public officials would intentionally, or fraudulently attempt to circumvent the rights afforded the public [under the act]. [¶] . . . [¶] To accept the premise that the right to sue for [nullification and voidance] is suspended until such time as an aggrieved party has knowledge of the action taken could lead to a state of

Looking beyond section 11130.3(a) itself to its legislative history, we find confirmation for our conclusion that the provision's right of action is indeed limited by the 30-day statute of limitations contained therein.

In 1984, at the request of Member of the Assembly Lloyd G. Connelly, the Attorney General issued an opinion in which he concluded, as pertinent here, that, in order not to imperil the finality of actions taken by state bodies, the Legislature, in originally enacting the act, had not intended that any violation of any of its requirements would result in the nullification and voidance of any such action. (*"Specific Agenda" Requirements of the Bagley-Keene Open Meeting Act*, 67 Ops.Cal.Atty.Gen. 84, 88-93 (1984).)

In 1985, Member of the Assembly Connelly authored Assembly Bill No. 214, 1985-1986 Regular Session (hereafter sometimes Assembly Bill No. 214) in order to add section 11130.3.

As introduced, Assembly Bill No. 214 provided in section 11130.3, in positive fashion, that an action taken by a state body in violation of the act's notice or open-and-public-meeting requirement would be null and void, unless one or more of certain conditions were satisfied, specifically, those relating to substantial compliance (as it would ultimately be phrased) and contractual obligation. (Assem. Bill No. 214 (1985-1986 Reg. Sess.) Jan. 9, 1985, § 2, p. 3.) It granted any interested person a right of action to seek nullification and voidance. (*Ibid.*) But it demanded that such a person had to commence an action within 60 days from the date the action in question was taken. (*Id.*, § 2, pp. 3-4.)

As subsequently amended in the Assembly, Assembly Bill No. 214 continued to provide in section 11130.3, in positive fashion, that an action taken by a state body in violation of the act's notice or open-and-public-meeting requirement would be null and void, unless one or more of certain conditions were satisfied, specifically, those relating to substantial compliance (as it would ultimately be phrased), contractual obligation, and now also evidence of indebtedness. (Assem. Amend. to Assem. Bill No. 214 (1985-1986 Reg. Sess.) Mar. 7, 1985, § 1, pp. 3-4.) It continued to grant any interested person a right of action to seek nullification and voidance. (*Id.*, § 2, p. 4.) And it continued to demand that such a person had to commence an action within 60 days from the date the action in question was taken. (*Ibid.*)

---

extreme uncertainty in the administration of public affairs. It should be noted that [the act] permits '*any person* . . .' to [sue]. This unlimited eligibility for prospective plaintiffs would lead to an even greater degree of uncertainty and difficulty in the determination of when a complainant should have had knowledge of the action to begin [the limitations period]." [Italics in original.]).

As amended in the Senate for the first time, Assembly Bill No. 214 now provided in section 11130.3, *in negative fashion*, that an action taken by a state body in violation of the act's notice or open-and-public-meeting requirement would *not* be null and void if one or more of certain conditions were satisfied, specifically, those relating to substantial compliance (as it would ultimately be phrased), evidence of indebtedness, and contractual obligation. (Sen. Amend. to Assem. Bill No. 214 (1985-1986 Reg. Sess.) May 23, 1985, § 1, p. 2.) It continued to grant any interested person a right of action to seek nullification and voidance. (*Ibid.*) And it continued to demand that such a person had to commence an action within 60 days from the date the action in question was taken. (*Ibid.*)

As amended in the Senate for the second time, Assembly Bill No. 214 continued to provide in section 11130.3, in negative fashion, that an action taken by a state body in violation of the act's notice or open-and-public-meeting requirement would not be null and void if one or more of certain conditions were satisfied, specifically, those relating to substantial compliance (as it was now phrased), evidence of indebtedness, and contractual obligation. (Sen. Amend. to Assem. Bill No. 214 (1985-1986 Reg. Sess.) June 13, 1985, § 1, pp. 2-3.) It now made plain that an action could be cured or corrected, and would not be null and void if it were. (*Id.*, § 1, p. 2.) It continued to grant any interested person a right of action to seek nullification and voidance. (*Ibid.*) But—of particular concern here—it now demanded that such a person had to commence an action within *30* days from the date the action in question was taken, a period that was fully one-half of the original one of 60 days. (*Ibid.*)

As amended in the Senate for the third and final time, Assembly Bill No. 214 continued to provide in section 11130.3, in negative fashion, that an action taken by a state body in violation of the act's notice or open-and-public-meeting requirement would not be null and void if one or more of certain conditions were satisfied, specifically, those relating to substantial compliance, evidence of indebtedness, contractual obligation, and now also the collection of a tax. (Sen. Amend. to Assem. Bill No. 214 (1985-1986 Reg. Sess.) June 19, 1985, § 1, p. 2.) It continued to make plain that an action could be cured or corrected, and would not be null and void if it were. (*Ibid.*) It also continued to grant any interested person a right of action to seek nullification and voidance. (*Ibid.*) And—again of particular concern—it continued to demand that such a person had to commence an action within 30 days from the date the action in question was taken. (*Ibid.*)

Section 11130.3's legislative history, which is set out above, confirms our conclusion that the provision's right of action is indeed limited by the 30-day

statute of limitations contained therein. That the provision does not allow any extension of time expressly shows itself on the surface. That it does not do so by implication appears beneath. Its legislative history defined strict conditions for the nullification and voidance of an action taken by a state body in violation of the act's notice or open-and-public-meeting requirement. Moreover, in its definition, it moved from strict conditions to even stricter ones. Among such strict conditions was its limitations period. It reduced it by half from 60 days to only 30 days. Its reduction was explicit. It precludes any expansion by implication—as by allowing some extension of time. Without a doubt, the provision's limitations period is indeed short. In fact, there is, apparently, none shorter. (See 3 Witkin, Cal. Procedure, *supra*, Actions, § 441, p. 558.) But, as is evident, it was surely the result of deliberate choice—a deliberate choice made in face of the fact that, as stated, the provision concerns itself exclusively with actions that have been taken in violation of the act's notice or open-and-public-meeting requirement, outside of the full light of day, implicating fraud in effect if not in intent. Had the Legislature meant to allow some extension of time of the limitations period at the same time at which it was shortening the limitations period itself, it would likely have made itself clear in the premises. It did not. What it did not speak we should not claim to hear.

In sum, section 11130.3(a)'s right of action is indeed limited by the 30-day statute of limitations contained therein.

### III

We now turn to the decision of the Court of Appeal denying the Regents' petition for writ of mandate insofar as it sought a peremptory writ against the superior court in challenge to its order denying their summary judgment motion.

At the threshold, the Court of Appeal impliedly concluded that the superior court's ruling on the summary judgment motion, and its resolution of the underlying statutory-construction issues, were subject to independent review. It was right. "Rulings on such motions"—including, as here, denials—"are examined de novo." (*Buss* v. *Superior Court* (1997) 16 Cal.4th 35, 60 [65 Cal.Rptr.2d 366, 939 P.2d 766].) The same is true of the resolution of such issues, inasmuch as they are pure questions of law. (See *20th Century Ins. Co.* v. *Garamendi* (1994) 8 Cal.4th 216, 271 [32 Cal.Rptr.2d 807, 878 P.2d 566].)

### A

We first consider whether the Court of Appeal correctly determined that, under the undisputed facts, Molloy did not have any right of action

pursuant to section 11130.3(a) for his Bagley-Keene Open Meeting Act cause of action.

It is accepted by all that the Regents are indeed subject to the act. That is as it must be. Section 92030 of the Education Code so declares in its terms. Subdivision (g) of section 9 of article IX of the California Constitution itself states that the Regents must generally cause their meetings to be open and public, impliedly as for the former and expressly as for the latter, "with . . . notice requirements as may be provided by statute," including the act.

We are of the view that the Court of Appeal's determination was in fact correct. Section 11130.3(a) grants an interested person a right of action to seek the nullification and voidance of an action taken by a state body in violation of the act's notice or open-and-public-meeting requirement only if he commences an action "within 30 days from the date the action was taken." Molloy did not commence his action seeking the nullification and voiding of the Regents' approval of SP-1 and SP-2 at the noticed and open and public meeting of July 20, 1995, within 30 days, but waited almost 7 months, until February 16, 1996.

Against our conclusion, Molloy argues that the Regents should be equitably estopped from raising section 11130.3(a)'s 30-day statute of limitations as an affirmative defense because, assertedly, they fraudulently concealed his cause of action.

As we have already explained, section 11130.3(a)'s 30-day statute of limitations does not allow any extension of time *at least as a general matter.*

Molloy argues to the contrary. He claims that section 11130.3(a)'s 30-day statute of limitations does in fact allow an extension of time. We disagree. Our analysis has demonstrated that the provision itself is without express or implied warrant in this regard, and that its legislative history stands in confirmation.

As we shall presently explain, section 11130.3(a)'s 30-day statute of limitations does not allow any extension of time *even through operation of the doctrine of fraudulent concealment.*

■ "Statute of limitations" is the "collective term . . . commonly applied to a great number of acts," or parts of acts, that "prescribe the periods beyond which" actions "may not be brought." (3 Witkin, Cal. Procedure, *supra*, Actions, § 405, p. 509.) The typical one has as its purpose the " 'protection of the defendant from stale claims of a dilatory plaintiff.' "

(*Bernson* v. *Browning-Ferris Industries* (1994) 7 Cal.4th 926, 936 [30 Cal.Rptr.2d 440, 873 P.2d 613], quoting 3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 529, p. 558, which is continued in 3 Witkin, Cal. Procedure, *supra*, Actions, § 691, p. 882; accord, e.g., *Kane* v. *Cook* (1857) 8 Cal. 449, 458; see, e.g., *Pashley* v. *Pacific Elec. Ry. Co.* (1944) 25 Cal.2d 226, 228 [153 P.2d 325]-229.)

The doctrine of fraudulent concealment, which is judicially created (see, e.g., *Bernson* v. *Browning-Ferris Industries, supra*, 7 Cal.4th at p. 931; *Kimball* v. *Pacific Gas & Elec. Co.* (1934) 220 Cal. 203, 210-213 [30 P.2d 39] (*per curiam*); *Kane* v. *Cook, supra*, 8 Cal. at pp. 458-461), limits the typical statute of limitations. "[T]he defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations . . . ." (*Sanchez* v. *South Hoover Hospital* (1976) 18 Cal.3d 93, 99 [132 Cal.Rptr. 657, 553 P.2d 1129]; accord, e.g., *Bernson* v. *Browning-Ferris Industries, supra*, 7 Cal.4th at p. 931; *Kimball* v. *Pacific Gas & Elec. Co., supra*, 220 Cal. at p. 210; *Kane* v. *Cook, supra*, 8 Cal. at pp. 458-461; see, e.g., *Pashley* v. *Pacific Elec. Ry. Co., supra*, 25 Cal.2d at pp. 229-230, 231-232.) In articulating the doctrine, the courts have had as their purpose to disarm a defendant who, by his own deception, has caused a claim to become stale and a plaintiff dilatory. (E.g., *Bernson* v. *Browning-Ferris Industries, supra*, 7 Cal.4th at p. 931; *Sanchez* v. *South Hoover Hospital, supra*, 18 Cal.3d at p. 100; see, e.g., *Pashley* v. *Pacific Elec. Ry. Co., supra*, 25 Cal.2d at pp. 229-230, 231-232; *Kane* v. *Cook, supra*, 8 Cal. at p. 458.) The doctrine arose in courts of equity and not in courts of law. (See, e.g., *Kimball* v. *Pacific Gas & Elec. Co., supra*, 220 Cal. at pp. 210-212; *Kane* v. *Cook, supra*, 8 Cal. at p. 458; see also *Bernson* v. *Browning-Ferris Industries, supra*, 7 Cal.4th at p. 931 [noting that the doctrine is an "equitable principle"].) Its genesis, however, did not prove to be its confines. It was early extended to be available "in all cases" (*Kane* v. *Cook, supra*, 8 Cal. at p. 461; accord, e.g., *Kimball* v. *Pacific Gas & Elec. Co., supra*, 220 Cal. at p. 211), that is to say, in actions at law as well as suits in equity (*Kane* v. *Cook, supra*, 8 Cal. at pp. 458-461). It enters into a statute of limitations, if at all, from without, by being "read into" it judicially. (*Kimball* v. *Pacific Gas & Elec. Co., supra*, 220 Cal. at p. 212.)

 To our mind, section 11130.3(a)'s 30-day statute of limitations precludes the doctrine of fraudulent concealment. The typical statute of limitations admits of the application of the doctrine of fraudulent concealment. The purposes of each are consistent the one with the other. That of the typical statute is to protect a defendant from a stale claim of a dilatory plaintiff. That of the doctrine is to disarm a defendant who, by his own

deception, has caused a claim to become stale and a plaintiff dilatory. Not so the doctrine of fraudulent concealment and section 11130.3(a)'s 30-day statute of limitations, which is not a typical one. The purposes of each are inconsistent the one with the other. That of the doctrine, as stated, is to disarm a defendant who, by his own deception, has caused a claim to become stale and a plaintiff dilatory. In contrast, that of section 11130.3(a) is to authorize the nullification and voidance of an action taken by a state body in violation of the act's notice or open-and-public-meeting requirement, but only under strict conditions—which, in their absence, entails the protection of even the most deceptive defendant from the freshest claim of the most diligent plaintiff.

It is true that section 11130.3(a)'s 30-day statute of limitations would not preclude the doctrine of fraudulent concealment if the statute contained the doctrine in terms or at least by implication. But it does not do so. The statute is altogether devoid of reference or even allusion to the doctrine. In pertinent part, it states no more, and no less, than that an interested person seeking the nullification and voidance of an action taken by a state body in violation of the act's notice or open-and-public-meeting requirement "shall . . . commence[]" an action "within 30 days from the date the action was taken."

It is also true that section 11130.3(a)'s 30-day statute of limitations would not preclude the doctrine of fraudulent concealment if the doctrine could be "read into" the statute judicially. (*Kimball* v. *Pacific Gas & Elec. Co., supra,* 220 Cal. at p. 212.) But it cannot be. The purpose that the Legislature had in enacting section 11130.3 was to authorize the nullification and voidance of an action taken by a state body in violation of the act's notice or open-and-public-meeting requirement, but only under strict conditions. One of those strict conditions—the result of its deliberate choice—is that an interested person must commence an action within 30 days of the date the action in question was taken. For us judicially to read the doctrine of fraudulent concealment into section 11130.3(a)'s 30-day statute of limitations would upset the legislative balance. ■ When, as here, that balance is not constitutionally offensive, we may not do so. (See *Scheas* v. *Robertson* (1951) 38 Cal.2d 119, 125-126 [238 P.2d 982]; *Muller* v. *Muller* (1960) 179 Cal.App.2d 815, 819 [4 Cal.Rptr. 419].)

■ Again Molloy argues to the contrary, that section 11130.3(a)'s 30-day statute of limitations does not in fact preclude the doctrine of fraudulent concealment.

Broadly, Molloy cites language in various decisions stating or implying that the doctrine is available "in all cases." (*Kane* v. *Cook, supra,* 8 Cal. at p.

461.) Originally, such language meant only that the doctrine could be invoked in actions at law as well as suits in equity. (*Id.* at pp. 458-461.) In current usage, it means only that it can be invoked generally. It did not, and does not, mean that it must be available here. Molloy asserts that never before has any decision held the doctrine unavailable. But never before has any decision addressed the question in this context. To arrive at an unprecedented conclusion is not to arrive at an erroneous one.

More narrowly, Molloy focuses on the general ends of the act, which, as stated in section 11120, are to cause "actions" of state bodies to be "taken openly," and to cause their "deliberation" to be "conducted openly," in order to keep "[t]he people . . . informed so that they may retain control over the instruments they have created." He claims that the preclusion of the doctrine of fraudulent concealment is inconsistent on the ground that it restricts the nullification and voidance of an action taken by a state body in violation of the act's notice or open-and-public-meeting requirement. But in focusing on the act's general ends, he ignores its specific means, which, as pertinent, authorize the nullification and voidance of such an action only under strict conditions, including that an interested person must commence an action within 30 days of the date the action in question was taken. The issue whether general ends prevail over specific means in case of conflict need not be resolved here. That is because there is no conflict. The act's general ends were stated in the act as originally enacted before it was amended to authorize the nullification and voidance of any actions whatsoever. Hence, they can hardly be deemed in conflict with the specific means authorizing such nullification and voidance, albeit only under strict conditions, including a limitations period of 30 days.[9]

### B

We next consider whether the Court of Appeal correctly determined that, under the undisputed facts, Molloy did indeed have a right of action pursuant to section 11130(a) for his Bagley-Keene Open Meeting Act cause of action.

---

[9]Because of the result that we reach, we need not, and do not, resolve other issues presented herein. For example, we pass over whether the doctrine of fraudulent concealment would be available in this case if it were not precluded by section 11130.3(a)'s 30-day statute of limitations. We do the same as for whether the *earlier* asserted collective commitment or promise by the Regents to approve SP-1 and SP-2 at the alleged secret serial "meeting" of at least a quorum of the board's members, including the Governor, which was alleged to be in violation of the act's notice and open-and-public-meeting requirements and to be subject to nullification and voidance on that basis, could "taint" the board's *later* approval of the resolutions at the noticed and open and public meeting of July 20, 1995, which was *not* alleged to be in violation of the act's notice or open-and-public-meeting requirement or to be subject to nullification and voidance on that basis.

Here, we are of the view that the Court of Appeal's determination was incorrect. Molloy did not have any right of action pursuant to section 11130(a), at least not to obtain the relief that he seeks. That is because that provision grants an interested person a right of action that extends only to present and future actions and violations and not past ones. Specifically, it grants a right of action: (1) to stop or prevent a present or future violation of the act—but *not* to reach back to a past one; and (2) to determine whether the act is applicable to a present or future action—but *not* a past one. Hence, it did not grant Molloy any right of action to nullify and void the Regents' *past* approval of SP-1 and SP-2 at the noticed and open and public meeting of July 20, 1995, or to prohibit the implementation of the resolutions as null and void. Neither did it grant him any right of action to determine whether the act was applicable to any *past* collective commitment or promise by the Regents to approve the proposed resolutions, prior to the noticed and open and public meeting of July 20, 1995, at the alleged secret serial "meeting" of at least a quorum of the board's members, including the Governor. And, on its very face, it did not grant him any right of action to determine whether the act was *violated* by their making of any such collective commitment or promise.

Molloy argues to the contrary, that he did indeed have a right of action pursuant to section 11130(a) to obtain the relief that he seeks. He says that that provision grants an interested person a right of action that extends to past actions and violations as well as present and future ones. But, as we have explained, the provision itself shows, and its legislative history confirms, that that is not so. He then says that we should deem the provision to grant such a person such a right of action, lest we tolerate the absence of a remedy against an action taken by a state body in violation of the act's notice or open-and-public-meeting requirement. So to deem means, in actuality, to amend—which belongs to the Legislature alone. In any event, a remedy does, in fact, exist, in the form of prevention by means of the threat of criminal liability under section 11130.7 against individual members of the state body. He complains that, without the right of action for which he contends, such persons "would be cloaked with immunity" of the most absolute sort. That is altogether false. Section 11130.7 stands in direct and complete contradiction.[10]

C

In view of the foregoing, it follows that the Court of Appeal erred by upholding the superior court's denial of the Regents' summary

---

[10]In support of his argument, Molloy cites certain Court of Appeal decisions that he claims hold that section 54960(a) grants an interested person a right of action under the Brown Act that extends to past actions and violations as well as present and future ones. (See, *ante*, at p. 526, fn. 6.) He does so in vain. At most, they merely assume or assert that it does. (*Ibid.*)

judgment motion on Molloy's Bagley-Keene Open Meeting Act cause of action. For Molloy did not have any right of action pursuant to either section 11130(a) or section 11130.3(a). Hence, there was no triable issue of material fact and they were entitled to judgment as a matter of law.

Because of its error on Molloy's Bagley-Keene Open Meeting Act cause of action, the Court of Appeal did not reach his California Public Records Act cause of action. Because of *its* error on the former, the superior court too had not reached the latter. The superior court should be allowed an opportunity to address the issue in the first instance. Molloy so argues. The Regents have no objection.

## IV

For the reasons stated above, we conclude that we must reverse the judgment of the Court of Appeal denying the Regents' petition for writ of mandate insofar as it sought a peremptory writ, and must remand the cause to that court with directions to remand it in turn to the superior court with directions to conduct proceedings not inconsistent with the views expressed herein.[11]

It is so ordered.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**BROWN, J.,** Concurring.—I agree with the reasoning and result of the majority opinion which correctly resolves the statute of limitations questions. I write separately to address another significant question not directly presented by the parties here. Tim Molloy's action rests on allegations that the Governor, an ex officio member of the Board of Regents of the University of California (Regents), conducted premeeting telephone conferences with a quorum of the Regents and secured their agreement to vote for the resolutions presented at that meeting. The underlying issue in this case is whether substantive discussions of official matters—whether conducted by telephone, letter, electronic mail, or face-to-face—among the members of a state government body subject to the Bagley-Keene Open Meeting Act (Gov. Code, § 11120 et seq.; hereafter all statutory references are to the Government Code) violate the statute's injunction that "[a]ll meetings of a state

---

[11]At the outset, the superior court must vacate its order denying the Regents' summary judgment motion. Then, if it concludes that there is no triable issue of material fact and that they are entitled to judgment as a matter of law on Molloy's California Public Records Act cause of action, it must grant their motion. If it does not so conclude, it must order summary adjudication in their favor on his Bagley-Keene Open Meeting Act cause of action.

body shall be open and public . . . ." (§ 11123.) The Bagley-Keene Open Meeting Act (the Act) does not, however, define "meeting."

In a handful of opinions, the Courts of Appeal have held that, at least as used in the Ralph M. Brown Act (§ 54950 et seq. [the open meeting law governing local agencies] (hereafter the Brown Act)), the term "meeting" "comprehends informal sessions at which a legislative body commits itself collectively to a particular future decision concerning the public business." (*Stockton Newspapers, Inc.* v. *Redevelopment Agency* (1985) 171 Cal.App.3d 95, 102 [214 Cal.Rptr. 561] (*Stockton*).) The seminal case is Justice Friedman's opinion in *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41, 47-51 [69 Cal.Rptr. 480] (*Guild*), a Brown Act decision that is the grandfather of California's modern open meeting jurisprudence. There, newspaper journalists sued to enjoin the county board of supervisors from attending, *en masse* and in the midst of a strike by public employees, informal luncheons at the Elks Club where county counsel and the officers of the public employees labor union also appeared (and from which plaintiffs were barred).

"[The Brown Act open meeting provision] is unequivocal in its central thrust upon official sessions for the transaction of official business, but somewhat ambiguous as it encounters peripheral gatherings or conversations among board members where public business is a topic," the court wrote. (*Guild, supra*, 263 Cal.App.2d at p. 47.) Affirming injunctive relief against the lunches, the court held that the statute's openness requirement was "a deliberate and palpable expression of the act's intended impact," and comprehends both "deliberation and action as dual components of the collective decision-making process . . . [which] . . . cannot be split off and confined to one component only, but rather comprehends both and either." (*Ibid.*) The ban on "secret" deliberations extends to committee meetings, the court ruled, since by "the specific inclusion of committees and their meetings, the Brown Act demonstrates its general application to collective investigatory and consideration activity stopping short of official action." (*Id.* at p. 49, fn. omitted.)

In a passage that has become a shibboleth in the case law, the *Guild* court wrote that "[i]n this area of regulation, as well as others, a statute may push beyond debatable limits in order to block evasive techniques. An informal conference or caucus permits crystallization of secret decisions to a point just short of ceremonial acceptance. There is rarely any purpose to a nonpublic premeeting conference except to conduct some part of the decisional process behind closed doors. Only by embracing the collective inquiry

and discussion stage, as well as the ultimate step of official action, can an open meeting regulation frustrate these evasive devices. . . . Construed in the light of the Brown Act's objective, the term 'meeting' extends to informal sessions or conferences of the board members designed for the discussion of public business. The Elks Club luncheon, attended by the Sacramento County Board of Supervisors, was such a meeting." (*Guild*, *supra*, 263 Cal.App.2d at pp. 50-51, fn. omitted; see also *Stockton*, *supra*, 171 Cal.App.3d at pp. 100-102 [serial telephone conversations among board members constituted a "meeting" and violated Brown Act]; *Rowen* v. *Santa Clara Unified School Dist.* (1981) 121 Cal.App.3d 231 [175 Cal.Rptr. 292] [closed session with prospective contractor was "meeting" despite absence of commitment]; *Frazer* v. *Dixon Unified School Dist.* (1993) 18 Cal.App.4th 781, 791-794 [22 Cal.Rptr.2d 641] [quorum of school board present to discuss district business was engaged in "collective acquisition and exchange of facts" and was thus a "meeting"]; *Roberts* v. *City of Palmdale* (1993) 5 Cal.4th 363, 376 [20 Cal.Rptr.2d 330, 853 P.2d 496] ["concerted plan to engage in collective deliberation" serially would violate the open meeting requirement] (dictum); see also *216 Sutter Bay Associates* v. *County of Sutter* (1997) 58 Cal.App.4th 860, 876-878 [68 Cal.Rptr.2d 492] [meetings between incumbent and newly elected supervisors were not "meeting[s]" within Brown Act since Act did not apply to supervisors-elect].)

Without faulting the result in *Guild* or cases relying on it, this formulation may be overbroad, encouraging later analyses to overlook the degree to which such broad restrictions may present formidable constitutional difficulties, and the fine but critical distinctions between the proper reach of open meeting legislation and the contending values that make up the foundation for the common law's "deliberative process" privilege. For example, in *Stockton*, *supra*, 171 Cal.App.3d at page 98, the court, relying on the analysis in *Guild*, held in substance that "a series of nonpublic telephone conversations, each between a member of the governing body of a local agency and its attorney, for the commonly agreed purpose of obtaining a collective commitment or promise by a majority of that body concerning public business, constitutes a 'meeting' within the purview of [the Brown Act]," thus violating the statute.

Whether the Legislature intended such a broad definition of meeting is unclear. The Brown Act defines a meeting to include "any congregation of a majority of the members of a legislative body at the same time and place to hear, discuss, or deliberate upon any item that is within the subject matter jurisdiction of the legislative body or the local agency to which it pertains." (§ 54952.2, subd. (a).) It prohibits the use of "direct communication, personal intermediaries, or technological devices" employed by a majority of

members "to develop a collective concurrence as to action to be taken on an item." (§ 54952.2, subd. (b).) The Brown Act defines "action taken" as "a collective decision made by a majority of the members of a legislative body, a collective commitment or promise by a majority of the members of a legislative body to make a positive or a negative decision, or an actual vote by a majority of the members of a legislative body when sitting as a body or entity, upon a motion, proposal, resolution, order or ordinance." (§ 54952.6.)

The provisions of the Bagley-Keene Open Meeting Act are more ambiguous. The Act declares the legislative intent that the deliberations of state agencies be "conducted openly" (§ 11120), specifies notice and agenda requirements, and authorizes a judicial action to determine whether an action taken in violation of these provisions is null and void. (§§ 11120, 11123, 11125, 11130.3.) The definition of "action taken" (§ 11122) is identical to the Brown Act, but "meeting" is not defined and a provision prohibiting use of direct communication, personal intermediaries or technological devices to develop a collective concurrence is not included in the Act. Nevertheless, the Legislature arguably intended these provisions to be congruent with Brown Act requirements and plaintiffs here assumed they are.

However, it is not clear the Legislature's commitment to openness requires so deep an intrusion into the deliberative process of the executive branch. Indeed, substantial impairment of the essential function of a coequal branch of government would be prohibited. Under the deliberative process privilege, senior officials of all three branches of government enjoy a qualified, limited privilege not to disclose or to be examined concerning not only the mental processes by which a given decision was reached, but the substance of conversations, discussions, debates, deliberations and like materials reflecting advice, opinions, and recommendations by which government policy is processed and formulated. The case law origins of what Wright, Miller and Marcus call "the governmental" or "deliberative process" privilege (8 Wright et al., Federal Practice & Procedure (1994) § 2019, pp. 296-312; 26A Wright et al., Federal Practice & Procedure (1992) § 5680, pp. 125-157) have been codified in the federal Freedom of Information Act (FOIA) (5 U.S.C. § 552 et seq.), section 5 of which exempts from disclosure "intra- and inter-agency memoranda" not ordinarily civilly discoverable. In *Times Mirror Co.* v. *Superior Court* (1991) 53 Cal.3d 1325, 1338 [283 Cal.Rptr. 893, 813 P.2d 240] (*Times Mirror*), this court held that the "legislative history and judicial construction of the FOIA . . . 'serve to illuminate the interpretation of its California counterpart,' " the Public Records Act (§ 6250 et seq.).

Underlying both public records statutes is an antecedent evidentiary privilege protecting from compelled disclosure opinions, recommendations, and

advice of government policy makers and their aides. The justification for that evidentiary limitation is the "recogni[tion of] a need for claims of privilege when confidentiality is necessary to ensure frank and open discussion . . . ." (*United States* v. *Weber Aircraft Corp.* (1984) 465 U.S. 792, 802 [104 S.Ct. 1488, 1494, 79 L.Ed.2d 814].) As the court wrote in *NLRB* v. *Sears, Roebuck & Co.* (1975) 421 U.S. 132, 150 [95 S.Ct. 1504, 1516, 44 L.Ed.2d 29], the cases "uniformly rest the privilege on the policy of protecting the 'decision making processes of government agencies' [citations]; and focus on documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.' [Citation.]" "The point," the *Sears* court went on to note, "is that the 'frank discussion of legal or policy matters' in writing might be inhibited if the discussion were made public; and that the 'decisions' and 'policies formulated' would be the poorer as a result. [Citation.] As a lower court has pointed out, 'there are enough incentives as it is for playing it safe and listing with the wind,' [citation] . . . ." (*Ibid.*)

In *Carl Zeiss Stiftung* v. *V. E. B. Carl Zeiss, Jena* (D.C. 1966) 40 F.R.D. 318, a widely quoted district court opinion, Judge Robinson wrote: "Nowhere is the public interest more vitally involved than in the fidelity of the sovereign's decision- and policy-making resources. [¶] . . . [¶] To the extent that such communications may later be scrutinized by others, the communicative process itself becomes embarrassed . . . . Freedom of communication vital to fulfillment of the aims of wholesome relationships is obtained only by removing the specter of compelled disclosure . . . . [G]overnment, no less than the citizen, needs open but protected channels for the kind of plain talk that is essential to the quality of its functioning." (*Id.* at p. 325, fn. omitted.)

These considerations, fundamental to the operations of government, justify a presumptive privilege for executive communications. As this court put it in *Times Mirror*: "The deliberative process privilege is grounded in the unromantic reality of politics; it rests on the understanding that if the public and the Governor were entitled to precisely the same information, neither would likely receive it." (53 Cal.3d at p. 1345; see also *State* ex rel. *Atty. Gen.* v. *First Judicial* (1981) 96 N.M. 254 [629 P.2d 330, 333-334]; *Killington, Ltd.* v. *Lash* (1990) 153 Vt. 628 [572 A.2d 1368]; *Hamilton* v. *Verdow* (1980) 287 Md. 544 [414 A.2d 914, 10 A.L.R.4th 333]; *Nero* v. *Hyland* (1978) 76 N.J. 213 [386 A.2d 846]; *Doe* v. *Alaska Superior Ct., Third Jud. Dist.* (Alaska 1986) 721 P.2d 617.)

The public has a right to know what decisions government officials make and to have officials articulate fully the basis on which they act. To the

extent officials seek to evade public scrutiny altogether, to avoid public discussion, to forge a majority in advance of public hearings on an issue, or to hide improper influences such as personal or pecuniary interest, public opprobrium is appropriate. The only question is whether the indirect public right to information about government activities justifies rules of engagement so stringent that the executive decisionmaking function is unreasonably impaired. There is a point beyond which open meeting requirements may effectively paralyze informed and efficient decisionmaking.

Judicial construction of the state's open meeting statutes suggesting that "serial" discussions among board members are "meetings" (and thus subject to statutory sanction) runs directly counter to a substantial and long-standing body of state and federal case law supporting the qualified privilege of confidentiality for discussions among government policy makers short of agreement and official action. Case law upholding a common law privilege of confidentiality for premeeting, prevote discussions that do not extend to a collective commitment are founded on important, even vital, commonsense notions of effective government. They recognize the indispensable value of candid, unrestrained, *nonpublic* debate and discussion, where final collective agreement and action on official matters occurs publicly and in compliance with statutory "sunshine" provisions.

Whatever the Legislature's intent, the public need for access to information must be balanced against the public's right to the efficient administration of public bodies. Most sunshine laws explicitly recognize that "the administrative process cannot be conducted entirely in the public eye." (*FCC v. ITT World Communications, Inc.* (1984) 466 U.S. 463, 469 [104 S.Ct. 1936, 1940, 80 L.Ed.2d 480] [discussing the Sunshine Act (5 U.S.C. § 552b(b))].) " '[I]nformal background discussions [that] clarify issues and expose varying views' are a necessary part of an agency's work. [Citation.] The Act's procedural requirements effectively would prevent such discussions and thereby impair normal agency operations without achieving significant public benefit." (466 U.S. at pp. 469-470 [104 S.Ct. at p. 1940], fns. omitted.)

"Inherent in an executive position is the duty to make rational decisions and to take responsibility for the consequences. Important decisions should not be made casually, but informal information may be as important as formal procedure in reaching the correct result, whether the decision needs to be rational, representative, or efficient." (*Hispanic Educ. Com.* v. *Houston Ind. Sch. Dist.* (S.D.Tex. 1994) 886 F.Supp. 606, 610.) "[I]t is the duty of public officials to persuade each other in an attempt to resolve issues, and it

makes little sense to suggest that they may listen to a group of nonmembers on important matters but not to their colleagues, who may be more expert on the subject than any other persons." (*Moberg* v. *Independent Sch. Dist. No. 281* (Minn. 1983) 336 N.W.2d 510, 517.) Yet, that is the acknowledged effect of defining meeting so broadly as to preclude members of multimember bodies from engaging in any collective inquiry related to an issue within their jurisdiction.

Such a militant view of public access comes at a high price. The normal kind of give-and-take between agency members that is the essence of collegial decisionmaking is deemed illegal. Investigating, factfinding, or brainstorming among any combination of members that could constitute a quorum—even when those contacts occur seriatim—is considered a violation of the open meeting laws. In short, collegial bodies are prohibited from behaving collegially and their members may be publicly pilloried for conducting themselves in a manner that—in any other contex—would be considered supremely rational.

It thus seems evident that the demand for openness in the conduct of government decisionmaking may sometimes be at odds with the perceived value of confidentiality to effective policy deliberations, and that fine lines must sometimes be drawn by the courts in order to promote the signal values of both. It may well be that the course of judicial construction of the Bagley-Keene Open Meeting Act and the Brown Act has failed to keep that line true by glossing the open meeting statutes in ways that intrude too deeply into areas where confidential deliberations have their greatest value. A case can be made, in short, that neither of California's open meeting acts was meant to trump the established privilege from disclosure for opinions, recommendations, advice and like materials that form part of the predecisional policymaking process among senior government officials.

Arguably, the only way to reconcile these contending values would be to take a more objective view of open meeting requirements, i.e., by concluding that the requirements of these acts are met if the members of an agency or board act at a properly noticed public meeting and their votes are publicly recorded. Almost unanimously, the cases and commentaries on the open meeting acts distinguish informal, functional "meetings," composed of a quorum of a board, from gatherings, whether face-to-face or constructively, of less than a quorum. That distinction is helpful because it attempts to distinguish between predecisional discussions among less than a quorum of board members and the informal, "functional meeting" at which secret decisions are crystallized "to a point just short of ceremonial acceptance."

(*Guild, supra,* 263 Cal.App.2d at p. 50.) Unfortunately, the distinction is so fact-bound that any allegation, no matter how speculative or inferential, creates the potential for contentious and intrusive litigation for its resolution, a contingency that may be worse than "push[ing] beyond debatable limits in order to block evasive techniques." (*Ibid.*) In short, if government policy makers must subject themselves to lawsuits and onerous discovery as the only means of establishing their compliance with the open meeting statutes, then openness in government is achieved only at the expense of effective decisionmaking. The real impact of an expansive construction of these laws is to put a premium on ignorance.

At oral argument, counsel for the plaintiffs spoke eloquently on behalf of openness in government and the public's right to know. When asked why he sought to obtain a judicial declaration that the Act had been violated even though the time for rescinding the board's action was long past, counsel said candidly that he thought the embarrassment of such a determination would be salutary. In his view, subjecting officials to the discipline of public humiliation provides sufficient justification for extending the statute of limitations in these cases. But, if public officials are to be pilloried, they ought to be guilty of some serious malfeasance or impropriety. As things stand, they can be convicted of conversation—the kind of conversation we would ordinarily want to encourage.

The ringing rhetoric of the open meeting acts jibes poorly with political reality. Taken to its logical extreme, openness may actually diminish the number and quality of public exchanges, increase divisiveness, and limit the flow of relevant information and the depth of critical collective scrutiny. (Note, *Facilitating Government Decision Making: Distinguishing Between Meetings and Nonmeetings Under the Federal Sunshine Act* (1988) 66 Tex. L.Rev. 1195, 1211.) The Constitutional Convention was not an open meeting, and although Madison took voluminous notes, he would not permit them to be published during his lifetime. " 'Nobody can say what sort of constitution would have emerged if the convention had been open to the public. . . . [But, had] Madison's notes been published before the states held their ratifying conventions, the Constitution would never have been adopted. The dialogue contained far too much that would have been seized upon by demagogues.' " (O'Brien, *The First Amendment and the Public's "Right to Know"* (1980) 7 Hastings Const.L.Q. 579, 592-593 (*O'Brien*), quoting Brant, *The Constitution and the Right to Know*, Mass Media and the Law (1970) 73, 76.)

" 'The case for democracy does not require that the citizen be familiar with all the bits and pieces of expert knowledge. He cannot be, in any case,

and we do him individually and the people collectively no credit if we believe that the political claims of democracy can be maintained only by telling lies that exaggerate the ability of the citizen. . . . Vindicating the "public's right to know" does not require that all specialized, private, and relatively inaccessible information be "made public." It demands, rather, that the public have access to those facts necessary for public judgment about public things . . . .' " (O'Brien, *supra*, 7 Hastings Const.L.Q. at p. 612, quoting Bathory & McWilliams, *Political Theory and the People's Right to Know*, in Government Secrecy in Democracies (Galnoor ed. 1977) pp. 3-21.)

Neither the Legislature nor the judiciary has been required to open every level of its deliberations to the public. Traditionally, the public has had access to governmental information through politically accountable decisionmaking. Thus, appellate courts continue to consult with their colleagues in confidential conferences; legislators may speak freely in the caucus without being required to disclose their comments. The executive branch should enjoy a similar flexibility. In this case, the Regents did hold a public meeting—one that lasted more than 12 hours. The public had a full opportunity to voice its opinions and the Regents' votes, and the basis for them, were part of the public record. Media coverage was extensive. It is difficult to see why more openness would be needed to permit the people to "retain control over the instruments they have created." (§ 11120.)

Baxter, J., concurred.