Filed 1/31/14

**CERTIFIED FOR PARTIAL PUBLICATION**[1]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of J.Q. and T.B. | |
| J.Q., | G047615 & G047727 |
|     Appellant, | (Super. Ct. Nos. 12D009260 & 12V000499) |
|       v. | |
| T.B., | O P I N I O N |
|     Appellant. | |

        Appeals from orders of the Superior Court of Orange County, Glenn R. Salter, Judge. Reversed in part, affirmed in part, and remanded with directions.

        Family Violence Appellate Project and Nancy K. D. Lemon, Jennafer Dorfman Wagner and Erin Canfield Smith; Aitken Family Violence Clinic and Wendy M. Seiden; O'Melveny & Myers and Luann Simmons, Anna-Rose Mathieson, and Ward Penfold for Appellant, J.Q.

        Law Offices of Shun C. Chen and Shun C. Chen for Appellant, T.B.

---

[1]      Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II and III.

J.Q.[2] and T.B. appeal from orders after the trial court denied J.Q.'s application for a domestic violence restraining order and request for spousal support against T.B.  J.Q. filed an appeal arguing the trial court erred in denying her request for spousal support pending the resolution of her application for a restraining order and in denying her application for a domestic violence restraining order.  T.B. filed a cross-appeal, contending that if this court is inclined to reverse the trial court's orders, the court erred in denying his request to present evidence of marriage fraud, and this court should address whether he acted in self-defense.

As we explain below, we conclude the trial court erred in ruling it did not have jurisdiction to award spousal support until after it found whether T.B. abused J.Q., and the court did not abuse its discretion in concluding J.Q. failed to establish by a preponderance of the evidence T.B. abused her.  Because of our holding, we decline T.B.'s request to address the merits of his cross-appeal.

FACTS

J.Q. and T.B. met online in September 2009.  J.Q. lived in Wuhan, China, and T.B. lived in Orange County; they corresponded via e-mail.[3]  T.B. visited J.Q. in China four times, and they often discussed their shared Christian faith and marriage. They communicated through interpreters and a translation device.  On November 2, 2010, J.Q. and T.B. were married in China in a state ceremony followed by a religious banquet.  They initiated the visa application process so J.Q. could move to the United

---

[2]     Appellant's motion to use her pseudonym throughout the opinion is granted.

[3]     In an e-mail dated October 19, 2009, J.Q. told T.B. she was formerly married but she did not have any children because her ex-husband had a "[s]exual [d]ysfunction."  In an e-mail less than one week later, J.Q. told T.B. her ex-husband was not "fertile."  The following May, J.Q. sent T.B. an e-mail where she discussed her ex-husband.  In that e-mail, J.Q. said the year after she married her ex-husband, she got pregnant and had an abortion.

States. After they were married, J.Q. and T.B. discussed their prior relationships further. T.B. told J.Q. that his ex-wife had reported him to the police three times. In an e-mail in August 2011, T.B. explained to J.Q. that he would divorce her for the following two reasons: infidelity; and doing something to separate him from his children, which included calling the police on him. After the visa was approved, J.Q. moved to the United States on January 10, 2012.[4]

Less than two months later, on March 5, 2012, J.Q. sought and obtained an emergency protective order against T.B. In her application for a domestic violence restraining order, J.Q. alleged T.B. abused her on March 4, 2012. She also asserted, however, that T.B.'s abusive behavior began almost immediately upon her arrival in the United States. T.B. was arrested on March 5, 2012.

A complaint charged T.B. with two misdemeanors: corporal injury on a spouse (Pen. Code, § 273.5, subd. (a)), and disturbing the peace (Pen. Code, § 415,

---

[4] Both J.Q. and T.B. agree that as part of the visa approval process T.B. was required by federal law to execute a support affidavit to prevent J.Q. from becoming a public charge. (8 U.S.C. § 1182(a)(4)(A).) The support affidavit, Form I-864, is a contract between the sponsor and the United States. (8 U.S.C. § 1183a(a)(1)(B).) Each intending immigrant must file an affidavit of support signed by the sponsor under penalty of perjury and shows a household income of at least 125 percent of the poverty level for that household size. (8 U.S.C. §§ 1182(a)(4)(C)(ii), 1183a(a)(1)(A); 8 C.F.R. § 213a.2(a), (b).) The sponsor's support obligation begins when the intending immigrant obtains permanent resident status. (8 C.F.R. § 213a.2(e)(1); 8 U.S.C. § 1183a(a)(2).) The sponsor's support obligation ends under the following circumstances: (1) the sponsored immigrant becomes a U.S. citizen; (2) the sponsored immigrant has worked for 40 qualifying quarters in employment covered under the Social Security Act; (3) the sponsored immigrant no longer holds permanent resident status; (4) the sponsored immigrant obtains a new grant of permanent residence in removal proceedings; or (5) the sponsored immigrant or sponsor dies. (8 C.F.R. § 213a.2(e)(2)(i); 8 U.S.C. § 1183a(a)(3).)

subd. (1)) (*People v. T.B.* (Super. Ct. Orange County, 2012, No. 12CM*****),[5] and a trial court issued a criminal protective order.

On March 7, 2012, J.Q. filed the following ex parte requests: (1) DV-110 application for a temporary restraining order; and (2) DV-100 application for domestic violence restraining order.

In her DV-100 application for domestic violence restraining order, J.Q. alleged the following: On the morning of March 4, 2012, T.B. demanded J.Q. have sexual intercourse with him. During the sexual intercourse, T.B. held her legs high in the air and when he penetrated her, her head hit the headboard. J.Q. was in a lot of pain, and she asked him to put her legs down. When T.B. became unsatisfied, he threw her legs down, got out of bed, threw things, yelled at her, and left. When T.B. returned, J.Q. asked him to have dinner with her, but he yelled at her and told her to leave. T.B. grabbed her collar and threw her to the floor. After T.B. closed the blinds, he repeatedly picked J.Q. up and threw her to the floor. After T.B. went upstairs, J.Q. followed him to talk to him, but he was still angry and verbally attacked her. T.B. threw her on the ground, and closed the blinds and turned off the lights. He grabbed her legs and tried to throw her out, and he threw her against the wall. J.Q. grabbed the bed, but T.B. threw her out of the room and locked the door. J.Q. stated she had visible injuries to her face, arm, and ankle, and she went to church for help. J.Q. said T.B. has several guns.

J.Q. also claimed T.B. had abused her on other occasions. After explaining T.B. did not let her go anywhere by herself, call anyone, let her learn English, give her any money, or buy her a cellular telephone, J.Q. claimed the following past abuse: T.B. demands "rough sex" with her every day. He "shov[ed] her around" and "hit [her] hard on [her] body but [he did] not leave any bruises except for the first beating around

---

[5]  We have omitted the applicable Orange County Superior Court case numbers to protect J.Q.'s anonymity. See *post* page 16, footnote 10.

the beginning of February." T.B. threatened to have J.Q. deported if she told anyone he hit her. She also filed an income and expense declaration. Judge Beatriz M. Gordon granted the temporary restraining order effective until a hearing on March 27, 2012.

T.B. filed a response. In his response, T.B. attributed their misunderstandings to language, cultural, and legal differences. T.B. said J.Q. "has made many false statements in regards to [his] relations with her." T.B. explained that a few days before J.Q. arrived in the United States, his house burned down. He claimed J.Q. was impatient with him on a variety of issues, including finding a new church, having a child, and managing the family's finances. He also claimed she verbally attacked him concerning child support payments, his friends, and his spirituality. T.B. denied threatening her with deportation or violence. T.B. opined J.Q. does not understand the seriousness of the charges she has made.

With regard to the night of March 4, 2012, T.B. stated J.Q. began arguing with him when he did not have dinner with her. T.B. explained that to escape "her constant verbal assaults," he went upstairs but she followed him upstairs and began to argue with him again. T.B. claimed he again tried to escape by walking out of the bedroom and J.Q. followed him. T.B. said he quickly tried to "jump[] back into the room and attempted to close" the door but "[J.Q.] quickly turned and threw herself between the door and the jamb to prevent [him] from closing it." T.B. believed this is what caused her injuries. T.B. said he let go of the door because he did not want to injure her. T.B. said that when J.Q. continued to verbally attack her, he told her that he was going to remove her from the room, a statement he immediately realized was a mistake. T.B. admitted he grabbed J.Q.'s coat and tried to move her towards the door. T.B. said that when J.Q. grabbed the footboard, the bed broke, and they fell on the bed. T.B. said he lifted J.Q. by the jacket and carried her headfirst out of the bedroom. T.B. explained that as he carried her headfirst, she swung her arms and legs, perhaps causing some of her injuries. T.B. claimed he gently sat her down and asked her not to follow him back into

5

the bedroom. When she ignored his request, T.B. admitted he placed his hand over her head to prevent her from getting up.

At the March 27, 2012, hearing, Judge Gordon found there was good cause to continue the matter and the temporary restraining order because of the pending criminal case. Judge Gordon continued the matter to May 15, 2012, and denied J.Q.'s oral motion for financial support. On April 23, 2012, J.Q. amended her DV-100 request for domestic violence restraining order to request spousal support.

One week later, J.Q. amended her DV-100 application for domestic violence restraining order a second time to clarify some translation inaccuracies in the original petition and supplement the petition with information concerning the criminal case. J.Q. added that items not discussed in the amendment "remain true and correct." J.Q. alleged the following: On the morning of March 4, 2012, T.B. demanded J.Q. have sexual intercourse with him and forcefully began to have sex with her. During sexual intercourse, T.B. held her legs high in the air and when he penetrated her, her head hit the headboard. J.Q. said that when she asked T.B. to put down her legs because she was in pain, he threw her legs down, got out of bed, yelled at her, threw things, and left. When T.B. returned later that evening, J.Q. asked T.B. to have dinner with her. T.B. became angry, told her to leave, closed the blinds and turned off the lights, grabbed her collar, and repeatedly threw her on the floor. After T.B. went upstairs, she followed him to try to talk with him. J.Q. claimed T.B. verbally attacked her, telling her she was a bad wife and she did not satisfy him sexually. After T.B. turned off the lights and closed the blinds, he threw her to the floor, against the walls, and onto the bed. J.Q. grabbed the bed, and T.B. broke the bed. T.B. grabbed her by the legs and dragged her out of the bathroom. J.Q. had visible injuries, and she was so frightened she went to her church seeking help. J.Q. again claimed T.B. would not afford her any independence or social interactions, and threatened to "kick [her] out of the house" if she did not satisfy his sexual needs or if she reported him to the police. J.Q. claimed T.B. abused her on prior

6

occasions. T.B. "hit [her] hard on [her] body" and engaged in "rough sex" that resulted in a painful physical injury and infections. She also filed an amended income and expense declaration.

At the hearing on May 15, 2012, T.B.'s counsel moved to continue the case until the criminal matter was resolved; the next hearing in the criminal matter was scheduled for July 9, 2012. J.Q.'s counsel objected and renewed J.Q.'s request for spousal support. Judge Gordon again found good cause to continue the matter and the temporary restraining order, denied J.Q.'s request for spousal support, and ordered T.B. to file an income and expense declaration 30 days before the next court hearing, which was scheduled for July 24, 2012.

On July 17, 2012, T.B.'s counsel filed an ex parte motion to continue the order to show cause (OSC) regarding the domestic violence restraining order to September 25, 2012. Counsel moved to continue because the criminal matter previously scheduled for July 9, 2012, was continued to August 2, 2012. T.B. did not move to continue the OSC regarding spousal support calendared for July 24, 2012. J.Q.'s counsel requested the matter be adjudicated as expeditiously as possible and requested spousal support.

At a hearing on July 17, 2012, before Judge Glenn R. Salter, the trial court continued the OSC re: domestic violence restraining order until September 25, 2012, because of T.B.'s pending criminal case. The court stated the parties could address the issue of whether he had jurisdiction to order spousal support at the hearing on July 24, 2012. The court ordered T.B.'s counsel to provide T.B.'s income and expense declaration on July 24, 2012. The court reissued the temporary restraining order until September 25, 2012.

At the hearing on July 24, 2012, the trial court explained the sole issue was whether it had jurisdiction to order spousal support before a hearing on the merits on the application for a domestic violence restraining order. After the trial court and counsel

7

engaged in a thorough discussion concerning the relevant legal authorities and legal issues (J.Q.'s counsel also submitted points and authorities and J.Q.'s declaration in support of her request), the court concluded it did not have jurisdiction to order spousal support before a hearing on the OSC re: domestic violence restraining order under the Domestic Violence Prevention Act (the Act) (Fam. Code, § 6200 et seq.).[6]  Relying on section 6324, the court stated it did have the power to award possession of the dwelling to J.Q., but because she did not want to disrupt T.B.'s children's lives, she was not seeking temporary use of the home.  The court added it also had the power to order the payment of debts pursuant to section 6324, indicating it was not spousal support, and suggested the parties independently agree on an appropriate amount.  Before conferring on that issue, T.B.'s counsel asserted J.Q.'s entry into the United States was fraudulent, and the court cautioned counsel pursuing that argument might not be in his client's best interests, and counsel reserved on that issue.  When the parties could not agree on an amount, the trial court ordered T.B. to pay J.Q. two payments of $800 for the payment of debts pursuant to section 6324.  The court opined it must find domestic violence occurred before ordering spousal support.  At the hearing, T.B. stated he had an income and expense declaration with him but had not given it to his attorney.  The court stated, "If you wish to turn it in today that's more than 30 days that's fine.  This will be an order after hearing.  It's less trouble if somebody wants to challenge it."  A findings and order after hearing was filed on September 5, 2012.

On September 4, 2012, the corporal injury on a spouse charge was dismissed, and T.B. pleaded guilty to disturbing the peace and was granted a deferred entry of judgment.  T.B. did not file his income and expense declaration until September 12, 2012.

---

6       All further statutory references are to the Family Code, unless otherwise indicated.

8

Trial commenced on September 25, 2012. J.Q. testified there were factual inaccuracies in her March 7, 2012, DV-100 request for a domestic violence restraining order because the translator's Chinese was not very good. J.Q. claimed her April 30, 2012, amended petition was factually accurate but it omitted much information. J.Q. explained she and T.B. were a good "match" for each other because they were both looking for "Christian" spouses. She said T.B. was a "gentleman" until a few days after she arrived in the United States.

J.Q. testified that on the evening of Saturday, January 14, 2012, J.Q. and T.B. had returned home from T.B.'s church when T.B. asked her how she felt about his church. J.Q. responded, "[she] couldn't feel the [Holy] Spirit and [she] couldn't understand what they were talking about" because of the language barrier. J.Q. claimed T.B. began cursing at her and used his hand to point at her face. She said T.B.'s children were so frightened they ran upstairs. J.Q. stated she was very scared as T.B. continued to curse at her. J.Q. stated T.B. "threw that translation device to me."[7] T.B.'s son testified J.Q. and T.B. argued but that is all he could remember. He went upstairs but not because he was scared.

J.Q. testified T.B. was a "gentleman" in public and introduced her to everyone as his wife but at home he was "a completely different person." J.Q. repeatedly attributed T.B.'s nastiness to her inability to satisfy his considerable sexual needs.

---

[7]     At trial, there was confusion as to whether T.B. threw the translation device "to" J.Q. or "at" her. During cross-examination, the trial court noted J.Q. kept saying T.B. threw the translation device "to her." When the court inquired whether T.B. threw it to her or at her, the interpreter answered, "threw the device at her, upon her." Not satisfied with that answer, the court asked J.Q. whether T.B. threw it at her, and she replied, "Yes." The court continued, "Or just in your direction?" J.Q. responded, "Yes, towards me." The trial court stated, "I'm as far as I'm going to go on this." A little later, when T.B.'s counsel asked J.Q. whether she tried to catch it, J.Q. answered she was trying to avoid it.

J.Q. testified that when T.B. repeatedly denied her request to take an English class, she went to one class, and when she returned, T.B. cursed at her and "bit [her] on [her] body."[8]  J.Q. said T.B. told her not to tell anyone what had happened.

J.Q. testified that on Monday January, 23, 2012, they went to a store and a child's birthday party.  J.Q. stated that as they drove T.B. continually cursed at her and used his hand to point at her.  She claimed T.B. used his hand to pound the center console until the cover fell off.  She added that T.B. would frequently tell her that she must follow his instructions and hammer the table with his hand as if to warn her of the consequences if she was not obedient.

J.Q. testified she sent T.B. an e-mail on February 24, 2012, to explain to him how unhappy she was.  In her e-mail, J.Q. stated she moved to the United States for T.B. and now that she had been living with him for one month, she believed he was a hypocrite.  She said, "See your anger, see your terrible, to see your violent behavior. I can't believe my eyes, I don't believe that.  [¶]  I miss the previous [T.B.], hundreds of letters, full of love, full of affection.  He told me, he loved [G]od, love life, love the wife, compassionate heart.  Love Christ family."  She added, "I tell you my dear husband, no matter how you abuse me.  [¶]  I never leave the house, I do not divorce."  She stated, "We need to calm down, we need to solve the problem.  [¶]  No relationship, if you hate me, you can curse in rage me, hit me, [I] never [s]trike back."  Finally, she suggested they go to marriage counseling so they could have a harmonious family and set a good example for the children.  T.B. replied in an e-mail the next day.  In his e-mail, he asked where "the old [J.Q.] is."  T.B. stated that she promised to honor and obey him, "but now she accuses, judges, argues with great impatience."  He added, "She provokes her husband to anger with her continues [*sic*] nagging and complaining."  T.B. claimed he only gets angry "when [she] provoke[s] [him] to anger."  T.B. concluded with the

---

[8]      J.Q. originally testified T.B. slapped her on the face but then immediately said, "[H]e didn't slap on my face he bit me on my body."

10

following: "I do not mind if you share what is on your heart. Then you must listen to me and then you must be silent. If you continue nagging, it will begin to anger me. If you do not stop after I tell you to stop, I will become angry."

J.Q. testified that about 6:00 a.m. on the morning of March 4, 2012, T.B. asked her to have sexual intercourse with him. She explained that T.B. held her legs in the air as they had sexual intercourse. J.Q. stated her head banged against the headboard as T.B. penetrated her. J.Q. said she was in pain and asked T.B. to put her legs down, but he refused. J.Q. asked again because it hurt. T.B. threw her legs down, got off the bed, cursed at her and told her she was a terrible wife, threw items that were on the nightstand, and left.

J.Q. testified T.B. returned home a few times that afternoon, but things began to escalate when T.B. returned home at dinner time. J.Q. stated she told T.B. she had made dinner, but he refused to eat and left again. J.Q. said that he returned later that night when she was calling her church in China. J.Q. claimed T.B. cursed at her, grabbed the telephone away from her, and smashed it. J.Q. testified she told T.B. that he should not treat her badly, and T.B. grabbed her throat and tried to throw her. J.Q. said T.B. went upstairs to take a bath. J.Q. explained she went upstairs to speak with T.B. and in the bathroom they continued to argue. J.Q. claimed T.B. closed the window blinds and turned off the lights so he could beat her. J.Q. stated T.B. asked her to leave, but she would not. J.Q. alleged T.B. grabbed the coat around her neck and tried to throw her out. J.Q. said T.B. threw her to the ground, threw her against the wall, and pushed her onto the bed. J.Q. stated she grabbed onto the bed.

On cross-examination, J.Q. admitted she took T.B.'s computer, guns, and driver's license. A long-time friend of T.B. testified that when he asked J.Q. whether she knew what happened to T.B.'s driver's license, J.Q. admitted she took the driver's license. When he told J.Q. that she needed to return it, the friend testified J.Q. became angry.

11

T.B. testified sexual relations with J.Q. were difficult because of their size difference but she never told him she wanted to cease sexual activities with him. T.B. explained that a couple days after J.Q. arrived in the United States, they began arguing about church, English classes, and a cellular telephone. T.B. said J.Q. complained he did not give her enough money, and she wanted to control the family's finances. With respect to March 4, 2012, T.B. explained he woke up and initiated sexual relations with J.Q. and they began to have sexual intercourse. When J.Q. complained it hurt, T.B. lifted her legs because that had helped in the past. T.B. stated J.Q. continued to complain and he put her legs down. T.B. said he tossed a bottle of lubricant onto the nightstand and left. T.B. testified he did not return home until dinner time, and when he grabbed a snack, J.Q. was upset because he did not eat the dinner she prepared and they argued about several issues, including finances.

T.B. said he went upstairs to take a bath. T.B. denied he grabbed J.Q.'s throat or tried to throw her, but he admitted grabbing the telephone from her because she threatened to call the police. T.B. threw the phone, it bounced off the couch, and it fell on the floor; he did not throw the phone towards J.Q. T.B. said that as he filled the tub and closed the blinds, J.Q. came upstairs, turned the lights on, opened the blinds, and began arguing with him again. T.B. closed the blinds, but left the lights on, and walked out of the master bedroom. T.B. explained that when J.Q. followed him, he quickly went back into the bedroom. T.B. said that when he tried to close the door, J.Q. threw herself into the doorway. T.B. told J.Q. that if she did not leave, he would carry her out of the room. When J.Q. continued into the bedroom, T.B. grabbed her coat and J.Q. grabbed the footboard of the bed, which caused the bed to break and T.B. and J.Q. to fall onto the bed. T.B. said he got up, picked up J.Q., and carried her out of the bedroom. T.B. testified that as he carried J.Q. out of the bedroom, she swung her arms against furniture and the door. T.B. said he set her on the floor, and when she tried to get up, he put his "hand out" so she could not get up. T.B. admitted he kicked the bathroom door down

12

because it had locked and the bathtub was running. T.B. testified he never struck, punched, or threw J.Q.

On cross-examination, T.B. admitted he had five guns. After his arrest, T.B. learned not all the guns were properly registered.

Calvary Chapel Pastor Will Lynn (Will), a former police officer, testified J.Q. arrived at the church on the evening of March 4, 2012. Will stated that when J.Q. arrived, "her face was puffed up, red around her cheeks and she seemed to be kind of in a daze." Will said "at some point [he] recognized her as a wom[a]n" who had come to the church two to three weeks before for marriage difficulties, and he got his wife to speak with J.Q.

Pamela Lynn (Pamela) testified that when she met J.Q., she looked "sad and distraught." Pamela believed J.Q. may have been in a car accident because "her face appeared - - it looked swollen and red on one side." Pamela said after she found an interpreter and J.Q. told her what had happened, Pamela called the police. Pamela explained the crime scene investigators took photographs of J.Q. approximately two to three hours after she arrived at the church.[9] Pamela opined the photographs did not accurately reflect the severity of J.Q.'s injuries. She said they called the paramedics because they were concerned J.Q. had internal injuries. Pamela said she did not realize how swollen J.Q.'s face was the night of the incident until she saw J.Q. a week later.

Pastor Tommy Cota testified he assisted J.Q. with retrieving her belongings from her home. Cota testified J.Q. did not want to go to the house alone. Cota described J.Q.'s demeanor at the house as nervous, confused, and scared.

On October 1, 2012, the trial court heard and considered counsels' arguments. The trial court began its oral statement of decision with an overview of what the court described as an atypical family law case. The court explained that on the day

---

[9]      The photographs were admitted into evidence and are part of the record on appeal.

13

J.Q. testified, the court certified interpreter appeared to have difficulty understanding the difference between "yelling" and "cussing," and "to" and "at." As to the remote control, the court stated the following: "The only thing we can all agree on is that the testimony was the remote control was thrown. It did not hit [J.Q.]. The court is going to accept the translation of -- the interpreter's translation as accurate. It will simply reflect that when it's on the record or in court listening to it, it was difficult to follow. I'm not sure how accurate it was."

Next, the trial court discussed the parties. The court described J.Q.'s testimony in Mandarin as "emphatic" and "almost aggressive in her demeanor." The court opined J.Q. had difficulty answering questions, recognizing perhaps she was merely trying to provide "her story her way." The court noted that during T.B.'s testimony J.Q. interrupted and emphatically said in English, "Not true. Not true." The court described T.B.'s demeanor as calm, "almost too calm." The court noted though that at times T.B.'s facial expressions indicated he was angry. The court discussed the interpreter and the parties to ensure its reasoning was preserved in the record.

Contrary to counsels' closing arguments, the trial court opined there were "cultural issues at play[]" and there is "a language problem[]" because a language's nuances are lost in translation. The court stated that for example, J.Q. wanted to control the family's finances, and in Japanese culture it is common for the wife to control the money. The court said that if Chinese culture is consistent with Japanese culture, the court would not be surprised if J.Q. made such a request. The court stated that although American culture is changing, many American men are unwilling to cede control of the family's finances, especially to a non-English speaker.

The trial court noted that although the parties had been married for a couple years, they lived together for only two months, and the problems began immediately upon J.Q. arriving in the United States. The court did not believe T.B.'s theory their

14

problems could be attributed to sexual incompatibility, and in any event, such incompatibility did not give T.B. the right to physically or verbally abuse J.Q.

As to the day of the incident, the trial court noted J.Q. did not dispute that when T.B. went upstairs to take a bath, J.Q., who the court described as "aggressive," went upstairs and "pursued the situation." The court said "what happened after that is rather substantially in dispute." The court added though that in determining what occurred, the court "has to pay attention to the notion . . . [J.Q.] made a strong effort to go [upstairs] and deal with the situation." Rejecting T.B.'s characterization of the record, the court stated there was "real physical evidence," including the damaged bathroom door, the damaged bed, and J.Q.'s face was "puff[y]." The court mused, however, this evidence was inconclusive and "the court was only hearing part of the story from both sides."

With respect to the court's jurisdiction, the court said both J.Q. and T.B. "wanted a Christian partner, but [the court] [was] not sure that either side showed a lot of Christian attitude about it." Nevertheless, the court accepted the parties' representation they were married.

With respect to whether there was domestic violence, the trial court stated the following: "The court finds that [J.Q.] has not shown by a preponderance of the evidence that there was domestic violence. There are certainly some indications that there were events which occurred. There are indications that the events have a different meaning. That is to say, [J.Q.] g[a]ve her statement and her explanation as to what happened. [T.B.] g[a]ve his statement and explanation as to what happened. [¶] Unfortunately, the evidence that we have is consistent with both of them factoring in the court's having seen the parties in court; having listened to their testimony; having observed them in court, the court does not feel [J.Q.] has made the necessary showing that there was domestic violence. [¶] But even if there were domestic violence, it's not often or it's often the case that some times domestic violence is situational. There was

15

certainly an event which occurred, a sexual encounter which was not going well. [¶] The court is of the opinion that . . . T.B. did stop when he was asked to stop even though the testimony was conflicting. But clearly whether he did or did not immediately stop this was clearly situational from the court's perspective. [¶] The parties were at an impasse. They had been having problems. The problems came to a head on this particular night and so whatever did occur if there was any form of domestic violence it was situational and on that basis the court will deny the request."

When J.Q.'s counsel requested a ruling on her spousal support request, there was a brief discussion concerning the court's concern the marriage was a "sham." After J.Q.'s counsel offered to produce their marriage certificate, the court accepted the fact they were married and ruled that because it concluded T.B. had not committed domestic violence, it could not award spousal support. The court dismissed the domestic violence action and consolidated it with T.B.'s annulment action to preserve any retroactivity of spousal support.[10]

J.Q. filed an appeal from the orders denying her request for spousal support and the court's finding T.B. did not abuse her. T.B. filed a cross-appeal from the order requiring him to make debt payments.

DISCUSSION

*I. Spousal Support*

Relying on section 6341, equity, and public policy, J.Q. argues the trial court erred in denying her request for spousal support pending resolution of her application for a domestic violence restraining order. T.B. responds the court properly denied J.Q.'s request because a trial court can award spousal support under the Act only after notice and a hearing, a point J.Q. agrees with. The issue before us then is "notice and hearing" of what? J.Q. asserts notice and hearing on the issue of spousal support.

---

[10] T.B.'s petition to nullify the marriage was dismissed on October 25, 2012. (Super. Ct. Orange County, No. 12D******.)

16

T.B. counters notice and hearing first on whether domestic violence occurred and, if it did, notice and hearing on spousal support. As we explain below, we agree with J.Q. Because we conclude J.Q.'s statutory contention has merit, we limit our discussion to section 6341, although policy considerations of course inform our conclusion.

"'When construing a statute, we must "ascertain the intent of the Legislature so as to effectuate the purpose of the law."' [Citations.] '[W]e begin with the words of a statute and give these words their ordinary meaning.' [Citation.] 'If the statutory language is clear and unambiguous, then we need go no further.' [Citation.] If, however, the language supports more than one reasonable construction, we may consider 'a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' [Citation.] Using these extrinsic aids, we 'select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' [Citation.]" (*People v. Sinohui* (2002) 28 Cal.4th 205, 211-212.) We review a trial court's resolution of statutory construction issues de novo. (*Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 531.)

The Act is codified in section 6200 et seq. The Act provides for emergency protective orders (Part 3 of the Act), and protective orders and other domestic violence prevention orders (Part 4 of the Act). As to protective orders and other domestic violence prevention orders, the Act details the manner in which certain orders can be issued (Chapter 2 of Part 4), including ex parte orders (Article 1), orders issuable after notice and a hearing (Article 2), and orders included in a judgment (Article 3). Section 6341, which concerns child support and spousal support, is included in Article 2, orders that can be issued after notice and a hearing. Custody, visitation, and support orders survive the termination of any protective order. (§ 6340, subd. (a).)

17

As relevant here, section 6341, subdivision (c), states: "If the parties are married to each other and no spousal support order exists, after notice and a hearing, the court may order the respondent to pay spousal support in an amount, if any, that would otherwise be authorized in an action pursuant to Part 1 (commencing with [s]ection 3500) or Part 3 (commencing with [s]ection 4300) of Division 9.[11] When determining whether to make any orders under this subdivision, the court shall consider whether failure to make any of these orders may jeopardize the safety of the petitioner, including safety concerns related to the financial needs of the petitioner." Section 6341, subdivision (d), provides, "An order issued pursuant to subdivision (c) shall be without prejudice in a proceeding for dissolution of marriage, nullity of marriage, or legal separation of the parties."

Based on a plain reading of section 6341, subdivision (c), we conclude a trial court may award spousal support to an applying party prior to concluding domestic violence has occurred. Section 6341, subdivision (c)'s first sentence is couched in terms of spousal support and does not mention or impose a requirement a trial court find domestic violence occurred before ordering spousal support. Giving the words their ordinary meaning, the first sentence authorizes the court to order the respondent to pay the applicant spousal support if the parties are married to each other and no spousal support order exists after notice and a hearing, to determine the amount, if any, that would otherwise be authorized in an action pursuant to Part 1 (commencing with [s]ection 3500) or Part 3 (commencing with [s]ection 4300) of Division 9. By its plain language, section 6341, subdivision (c), does not impose the requirement a trial court must find domestic violence occurred before awarding spousal support.

---

[11] Division 9, Part 1 of the Family Code, provides the definitions and general provisions governing, as relevant here, spousal support, and Part 3 concerns spousal support specifically.

18

Our interpretation of section 6341, subdivision (c), is supported by the Act's purpose, which is codified in section 6220. Section 6220 states, "The purposes of this division are to prevent the recurrence of acts of violence and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." Additionally, section 6341, subdivision (c)'s second sentence requires a trial court in determining whether to award spousal support to "consider whether failure to make any of these orders may jeopardize the safety of the petitioner, including safety concerns related to the financial needs of the petitioner."

The evil the Act seeks to remedy is the commission of domestic violence, and its purpose in part is to provide for the parties' separation to ensure the applicant's safety. A trial court must consider an applicant's physical safety and financial needs in making its determination whether to award spousal support. To require the applicant to establish domestic violence occurred before awarding spousal support defeats the Legislature's purpose because if the applicant does not have the financial resources, the applicant is often times forced to remain living with the respondent and the recurrence of acts of violence and sexual abuse is increased while the request for a domestic violence restraining order is litigated. Those concerns, the applicant's safety and financial needs, are magnified when as here there is a related criminal case that is repeatedly continued. We cannot envision the Legislature intended for an applicant to wait for a spousal support award while the respondent repeatedly continues his/her criminal case, even for the legitimate purpose of obtaining a better deal in the criminal matter. Such delay does nothing to protect an applicant who has been the victim of acts of violence and/or sexual abuse. Instead, we conclude section 6341, subdivision (c), contemplates the trial court promptly hear a request for spousal support upon proper notice, while considering an applicant's safety and financial needs, irrespective of the merits of an application for a domestic violence restraining order.

19

The Act's legislative history also supports our conclusion the Legislature was concerned with a victim's inability to live apart from a batterer due to a lack of financial resources. The Senate Committee on Judiciary analysis of the Act provides insight in this regard. After stating that the bill, Assembly Bill 2148, would specify the factors a court must consider in determining whether to award spousal support under the Act, and that any spousal support award was made without prejudice in any dissolution or nullity of marriage, or legal separation action, the analysis explained why the bill was necessary. "[D]omestic violence victims are often forced to return to the batterer out of economic necessity because their inability to participate in custody and support proceedings due to inadequate resources results in them not securing the child or spousal support that would provide financial independence enabling them to separate from the batterer." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2148 (2003-2004 Reg. Sess.) as amended April 28, 2004.) The Legislature clearly contemplated financial independence is a paramount concern for domestic violence victims.

Finally, Article 2, the same article that includes section 6341, includes other statutory provisions that support our conclusion a finding domestic violence occurred is not a prerequisite for awarding spousal support under the Act. As we explain above, Part 4 of the Act governs protective orders and other domestic violence prevention orders, and Chapter 2 of Part 4 governs the issuance of orders. Chapter 2 includes the following three articles: Article 1-Ex parte orders; Article 2-Orders issuable after notice and a hearing; and Article 3-Orders included in judgments. The three articles govern the issuance of orders at different stages of a domestic violence proceeding. Section 6341 is included in Article 2, orders issuable after notice and a hearing. Section 6342 and 6343, both of which are also included in Article 2 require a notice and hearing, but which by their plain language contemplate a finding of abuse.

Section 6342 governs orders for restitution to the petitioner for loss of earnings and out-of-pocket expenses as a result of abuse inflicted by respondent (§ 6342,

20

subd. (a)(1)), restitution to the respondent for out-of-pocket expenses incurred as a result of an ex parte order that a court concludes is supported by insufficient evidence at a noticed hearing (§ 6342, subd. (a)(2)), and restitution to a public or private agency for costs of service to petitioner as a result of abuse inflicted by respondent (§ 6342, subd. (a)(3)). Section 6343, subdivision (a), authorizes a trial court to order, after a noticed hearing, the "restrained party" to participate in a batterer's program. By their plain language, both sections 6342 and 6343 contemplate a trial court made a determination domestic violence occurred, and both sections are included in Article 2, the same article as section 6341. Had the Legislature meant to require a finding of domestic violence, i.e., abuse, as a condition precedent to a spousal support award under section 6341, subdivision (c), we conclude the Legislature would have included it in section 6341 like it did under sections 6342 and 6343. (See *Ford Motor Co. v. County of Tulare* (1983) 145 Cal.App.3d 688, 691 [well recognized principle of statutory construction that when Legislature carefully employed term in one place and excluded it in another, it should not be implied where excluded]; 2A Singer & Singer, Sutherland Statutory Construction (7th ed. 2007) § 47.23, pp. 398-421 [*expressio unius est exclusio alterius*, expression of one thing in statute ordinarily implies exclusion of other things, where consistent with legislative intent].)

Here, the trial court effectively amended section 6341, subdivision (c), to read, "If the parties are married to each other and no spousal support order exists, after notice and a hearing *on petitioner's successful request for a domestic violence restraining order*, the court may order the respondent to pay spousal support in an amount, if any, that would otherwise be authorized in an action pursuant to Part 1 (commencing with Section 3500) or Part 3 (commencing with Section 4300) of Division 9." Based on section 6341, subdivision (c)'s plain language, the Act's purpose and legislative history, and related statutory provisions, we conclude that is not what the Legislature intended.

21

T.B. argues the trial court should not award spousal support without notice and a hearing. We agree. The trial court here never conducted a hearing on whether and in what amount T.B. should pay J.Q. spousal support because the court concluded it did not have jurisdiction to award J.Q. spousal support until it concluded domestic violence occurred. We do note, however, T.B. was certainly on notice the court was considering making such an order on July 17, 2012, when the court ordered him to produce his income and expense declaration at the next hearing on July 24, 2012. T.B. did not comply with that order as he did not file the declaration until September. Thus, on remand, the trial court should conduct a noticed hearing to determine whether a spousal support award is proper, and consider all relevant issues before making an award.

T.B. also complains the trial court erred in ordering him to make debt payments pursuant to section 6324 because there was no evidence J.Q. would incur any liens or encumbrances that were to come due. Section 6324, states, "The court may issue an ex parte order determining the temporary use, possession, and control of real or personal property of the parties and the payment of any liens or encumbrances coming due during the period the order is in effect." The court certainly had the power to award the temporary use of the family dwelling to either T.B. or J.Q. When J.Q. indicated she did not want to disrupt T.B.'s children's routine, the court properly ordered T.B. to pay J.Q. $1,600 over two months to cover J.Q.'s future living expenses pursuant to section 6324.

II. *Restraining Order*

J.Q. contends the trial court erred in concluding T.B. did not abuse her because of the following: (1) the court misinterpreted the definition of "abuse"; (2) the

22

court misapplied the standard of proof; and (3) the court considered irrelevant facts.  We will address each of her contentions in turn.[12]

## A.  Abuse

J.Q. claims the trial court misinterpreted the definition of "abuse" based on the following:  (1) the court interpreted "abuse" as limited to "intentional physical abuse"; (2) the court interpreted "abuse" to exclude "situational" abuse; and (3) the court erred in failing to consider T.B.'s past acts of abuse.

Section 6300 provides, "An order may be issued under this part, with or without notice, to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved, if an affidavit or, if necessary, an affidavit and any additional information provided to the court pursuant to [s]ection 6306, shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse."  Courts construe the Act liberally and may issue a domestic violence restraining order when the applicant makes the requisite showing by a preponderance of the evidence.  (*Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 137 (*Gdowski*).)

Section 6203 provides:  "For purposes of this act, "abuse" means any of the following:  [¶] (a) Intentionally or recklessly to cause or attempt to cause bodily injury. [¶] (b) Sexual assault.  [¶] (c) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another.  [¶] (d) To engage in any behavior that has been or could be enjoined pursuant to [s]ection 6320."

Section 6320, subdivision (a), states:  "The court may issue an ex parte order enjoining a party from molesting, attacking, striking, stalking, threatening, sexually

---

[12]        In her reply brief, J.Q. clarifies the issues on appeal.  She states, "[T.B.] mistakenly assumes [she] is challenging the trial court's factual findings" and "incorrect[ly][]" claims we should review the court's conclusion for substantial evidence. J.Q. reiterates the issue on appeal is whether the court abused its discretion when it "misconstrued" the Act.

23

assaulting, battering, harassing, telephoning, including, but not limited to, making annoying telephone calls as described in [s]ection 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party . . . ." The actual infliction of physical injury or assault is not required for a finding of abuse. (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1496 [reading and publicly disclosing e-mails]; *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1290-1291 [persistent unwanted telephone calls or letters].)

Courts construe the Act liberally and may issue a domestic violence restraining order when the applicant makes the requisite showing by a preponderance of the evidence. (*Gdowski, supra,* 175 Cal.App.4th at p. 137.) "A grant or denial of injunctive relief is generally reviewed for abuse of discretion. (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 849-850 . . . .) This standard applies to a grant or denial of a protective order under the [Act]. [Citation.] [¶] 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.] At the outset, however, we must determine whether the trial court applied the correct legal standard to the issue in exercising its discretion, which is a question of law for this court. 'The scope of discretion always resides in the particular law being applied; action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an abuse of discretion.' [Citations.]" (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420-421 (*Gonzalez*).) And we defer to the trial court's fact finding authority, including the credibility of witnesses, and view the facts in the light most favorable to the judgment. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 787.)

24

*1. Intent*

J.Q. contends the trial court erred in interpreting section 6203 to prohibit only "[i]ntentional [p]hysical [a]buse" and T.B.'s admissions established he abused her. We disagree.

Based on a complete reading of the trial court's statements, we conclude the court did not abuse its discretion in concluding J.Q. failed to carry her burden of proving T.B. abused her by a preponderance of the evidence. Although the court did conclude "incidents . . . occurred" and there was "real physical evidence," specifically mentioning J.Q.'s "puffy" face, the court concluded J.Q. did not make the necessary showing of abuse. Despite T.B.'s admissions (he told J.Q. he would remove her from the bedroom, he grabbed her coat and tried to move her out of the bedroom, he picked her up and carried her headfirst out of the bedroom, after he set her on the ground he put his hand on her head and prevented her from getting up, and his action likely caused the injuries to her neck and arms), the court after hearing and considering those admissions, weighed that evidence against J.Q.'s declarations and testimony, including her demeanor,[13] and concluded T.B.'s conduct did not constitute abuse as defined in section 6203.

Contrary to J.Q.'s contention otherwise, we do not read the trial court's statements as evidence the court believed "abuse" is limited to "intentional physical abuse" contrary to section 6203's plain language. To the contrary, the court's statements, when read in their entirety, establish it was a "she said/he said" case, and after considering the evidence and observing the parties' demeanor, the court concluded

---

[13]     J.Q. complains "her demeanor when explaining her side of the story are hardly the issue here[.]" She is wrong. "[T]he court . . . may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of [her] testimony at the hearing, including but not limited to any of the following:  [¶]  [Her] demeanor while testifying and the manner in which [she] testifies." (Evid. Code, § 780, subd. (a); *People v. Jackson* (1989) 49 Cal.3d 1170, 1205-1206.)

25

J.Q. failed her burden of proof. Thus, the trial court did not abuse its discretion in concluding J.Q. failed to establish by a preponderance of the evidence T.B. abused her.

## 2. *Situational Abuse*

J.Q. claims the trial court erred because it concluded the Act does not prohibit "'situational' abuse." When discussing the issue of whether domestic violence occurred, the court first concluded J.Q. failed to prove by a preponderance of the evidence T.B. abused her. The court then went further and stated that even if there was domestic violence, it was "situational," discussing primarily the sexual encounter that occurred on the morning of March 4, 2012.

It is unclear what the trial court meant by "situational abuse." The court's statements could be interpreted simply as its conclusion the sexual encounter in the morning served as a springboard for the incident later that evening. Or the court's statements could be interpreted as creating a heightened burden of proof requiring more than a single situation. This interpretation would be problematic because we do not read the definition of "abuse" under the Act so narrowly. Had this been the only rationale the trial court provided for its ruling, we would have likely reversed the order because the Act does not require a particular situation for a finding of abuse.

We do not interpret the Act to exclude "situational abuse." Every act of abuse occurs in a situation, or under circumstances, where one person becomes physically or verbally abusive. Either the party complaining of abuse establishes by a preponderance of the evidence abuse, as defined in sections 6203 and 6320, occurred or the party does not.

## 3. *Past Acts of Abuse*

J.Q. asserts the trial court erred in concluding T.B. did not abuse her because the court ignored the abuse that occurred prior to March 4, 2012. J.Q. cites to the following evidence of alleged abuse that she claims occurred before March 4, 2012: T.B. threatened to divorce her if she reported him to the police; T.B. threw the translation

26

device at her; T.B. slapped J.Q. when she asked to attend an English class; T.B. pounded the center console with his fist; T.B. would pound the table with his fist and suggest to J.Q. that he would do the same to her if she did not obey him; and T.B. told her to stop badgering him or he would become angry. Although the court did not specifically mention each of the alleged instances of abuse, the court did state it had reviewed "all the evidence in the record" and ultimately concluded J.Q. failed to satisfy her burden of proof. Before making its ruling on whether domestic violence occurred, the court, to develop an adequate record, discussed several issues that the court did not believe would translate onto a "cold record" on review.

First, specifically addressing one of the incidents J.Q. now complains the court did not consider, the court noted it was concerned the interpreter was having difficulty interpreting whether T.B. threw the translation device "at" J.Q. or "to" her. During J.Q.'s testimony on this point, the court attempted to clarify what happened but after several attempts moved on. The court ultimately accepted "the interpreter's translation as accurate[,]" but was "not sure how accurate it was."

Second, as to the parties, the trial court observed the parties' demeanor during trial and concluded J.Q. was "aggressive" and T.B. was "not as calm on the inside as he was on the outside." The court opined there was "clearly a language problem" and the parties were providing only part of the story. Based on a complete reading of the trial court's oral statement of decision, we conclude the court heard and considered all the evidence, including the evidence concerning the prior acts of alleged abuse, and found J.Q. failed to establish by a preponderance of the evidence T.B. had abused her.

*B. Standard of Proof*

J.Q. contends the trial court erred in applying the applicable standard of proof, proof by a preponderance of the evidence. In support of her argument, J.Q. cites to her own testimony concerning the incident on March 4, 2012, and alleged prior acts of

27

abuse, T.B.'s admissions, physical evidence, and independent witness testimony. Although J.Q. characterizes this argument as one concerning the standard of proof (see *supra* fn. 9), what J.Q. really asks us to do is reweigh the evidence and substitute our decision for the trial court's decision. That we cannot do. (*Gonzalez, supra,* 156 Cal.App.4th at pp. 420-421.) And we have already addressed J.Q.'s contentions regarding T.B.'s admissions and the alleged instances of prior abuse. We need not discuss these claims further.

*C. Irrelevant Facts*

Relying on *Quintana v. Guijosa* (2003) 107 Cal.App.4th 1077 (*Quintana*), and citing to the trial court's musings about "Chinese culture" and "Christian attitude," J.Q. argues the court erred in relying on irrelevant facts in concluding T.B. did not abuse J.Q. Not so.

We agree with J.Q. that a trial court should refrain from commenting on matters outside the record. And we should not have to remind the court comments about cultural differences do not translate well into an appellate record and can be misinterpreted despite the court's best intentions. That being said, we do not interpret the court's statements as evidence it considered irrelevant matters in concluding J.Q. failed her burden of proof. In analogizing Japanese culture to Chinese culture, the court was attempting to explain, along with the language barriers, what it perceived as the causes of the acrimony between T.B. and J.Q. In the future, the court should limit its comments to matters in the record.

As to the court's comments on Christianity, the record is replete with references to the parties' religious faith. J.Q. herself testified that when she and T.B. began dating, she felt they were a good match because they were both searching for "Christian" partners. And there was evidence attending church and finding the right church was important to both parties. The court merely offered its opinion neither T.B. nor J.Q. exhibited "Christian" behavior in their relationship.

28

J.Q.'s reliance on *Quintana, supra,* 107 Cal.App.4th 1077, is misplaced. In that case, petitioner offered evidence her husband had repeatedly threatened and assaulted her. In denying a protective order, the trial court ignored that evidence, concluding petitioner was not entitled to a protective order because she should have been in Mexico taking care of her children rather than in the United States with her husband. (*Id.* at pp. 1078-1079.) The Court of Appeal concluded "the trial court abused its discretion by deciding this case on facts entirely irrelevant to the [Act], the purpose of which is not to mandate that parents live with their children, but to 'prevent the recurrence of acts of violence and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence.' [Citation.]" (*Id.* at p. 1079.) Unlike the petitioner *Quintana*, J.Q. failed to establish by a preponderance of the evidence that T.B. abused her. The court's comments do not establish it based its decision on facts that are antithetical to the Act's purpose of preventing domestic violence. Therefore, the court did not consider irrelevant facts in concluding J.Q. did not satisfy the applicable burden of proof.

### III. T.B.'s Cross-Appeal

T.B. requests that if we do anything other than affirm the judgment, he respectfully asks us to address the following issues: (1) Is T.B. entitled to present evidence of marriage fraud?; and (2) Did T.B. act in self-defense? Because we affirm that part of the trial court's judgment finding J.Q. did not prove T.B. abused her, we need not address his second claim. With respect to his first claim, as we explain above, we remand the matter to determine whether J.Q. was entitled to spousal support under section 6341 pending the determination of her request for a domestic violence restraining order. Section 6341, subdivision (c), authorizes a trial court to award spousal support after a noticed hearing in an amount authorized by the Family Code, "[i]f the parties are married to each other and no spousal support order exists." On remand, T.B. is entitled to litigate all relevant issues before the trial court makes a spousal support award.

29

DISPOSITION

The July 24, 2012, and September 5, 2012, orders denying spousal support are reversed.  The October 1, 2012, order finding T.B. did not abuse J.Q. is affirmed. Each party shall bear their own costs on appeal.


O'LEARY, P. J.

WE CONCUR:


RYLAARSDAM, J.


THOMPSON, J.